THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN R. CLEESEN, Defendant-Appellant.

Fourth District   No. 4—88—0182

Opinion filed December 15, 1988.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

Defendant Melvin R. Cleesen was charged by indictment on August 28, 1987, with three counts of first degree murder, one count of home invasion, and one count of conspiracy (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3), 12—11(a)(2), 8—1(a)).

On October 22, 1987, the defendant filed a motion to suppress statements he made to police officers during interrogations that took place on August 10, 1987. The motion alleged that the statements were made as a result of threat and coercion, and therefore, were not given voluntarily. A suppression hearing was held on November 2, 1987, at the conclusion of which the motion was denied. The evidence presented at this hearing will be discussed where relevant to the issues presented.

One of the murder counts (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) was dismissed on January 14, 1988, on motion by the State. The cause then proceeded to trial on the remaining four counts. The prosecutor's theory was that the defendant was accountable for the conduct of Tommy Dailing and Paul Wayman. The evidence disclosed

that Dailing and Wayman had broken into an upstairs apartment located at 1110½ State Street in Quincy, Illinois, and ransacked the apartment, looking for money. The incident took place sometime between the hours of 7 p.m. on August 6, 1987, to 1:30 p.m. on August 7, 1987. The woman who lived in the apartment, Mae Barry, died during the incident.

Dr. Jordin Lee Mann, who performed the autopsy on Barry's body, testified that the exact cause of death was undetermined. In performing the autopsy, Mann observed multiple contusions, located primarily on Barry's arms and legs and around the mouth. He found an area of hemorrhage between Barry's scalp and skull. Further, he determined that there had been two distinct blows to the head from a fairly broad surface. He reasoned that one blow might have been caused by someone knocking her off the bed and banging her head on the floor. Mann also found extensive blunt trauma to Barry's chest which resulted in rib fractures. He believed that this could have been caused by someone jumping on her as she lay on the bed. Additionally, Mann found some type of blunt injury to Barry's left back area. At the time of her death, Barry was 85 years old, was 5 feet 1½ inches tall and weighed 89 pounds.

Charlie Mudd owned the apartment building in question and lived in the apartment located downstairs from Barry's. He had thrown a party at his apartment on the evening of the incident. A number of people attended the party and several kegs of beer were served. Among those attending the party were the defendant, Tommy Dailing, and Paul Wayman—defendant's mother's live-in boyfriend. According to Mudd, he had seen Barry in her apartment at approximately 7 p.m. on the night of the party. At approximately 1:30 p.m. the following day, Mudd found Barry's door ajar and discovered her body. The police were then contacted.

Quincy police officers Grant and Meyer initially investigated the scene. When the officers arrived, they found Barry lying supine on the floor by her bed, and the apartment was in a state of disarray. Furniture had been overturned, a fan had been knocked to the floor, the bed and rug were pulled away from the wall, and the mattress was off-center on the bed. In the closet area, numerous containers, some containing jewelry, were scattered with the lids off. The investigating officers removed the carpet and found two envelopes, one containing $250 and the other containing $275. They discovered a broken chain lock on the apartment door and found fingerprints on the transom above the door, indicating a forced entry. No valuables or cash appeared to be missing. An employee of Illinois Bell Telephone Com-

pany testified that a telephone line along the outside of the apartment building had been cut by a pocketknife or a pair of cutters.

Mudd also owned an apartment building located behind the one in which Barry lived. Mudd testified that Melvin "Butch" Schamma, who lived in the second apartment building, had previously told Mudd that he thought Barry had large amounts of cash in her apartment. Mudd further testified that Tommy Dailing, an amateur boxer, had lived with Schamma during part of the summer of 1987. Mudd had several prior burglary and theft convictions.

Schamma testified that Dailing had lived upstairs from him. Schamma admitted telling Dailing and Wayman that he thought Barry had as much as $20,000 in cash in her apartment. He further admitted to having "several" conversations with Dailing about the cash. Schamma stated that he had been involved in a number of residential burglaries with Dailing and Wayman.

Linda Cleesen, defendant's mother, testified that Paul Wayman and the defendant had developed a father- and son-like relationship. Cleesen stated that Wayman and the defendant left home on the evening of August 6, 1987, and returned at 2 a.m. the following morning. The two were "drunk" and Wayman had to assist the defendant into the house.

Sheriff Nall of the Adams County sheriff's department testified that he interviewed Dailing on August 9, 1987, several days after the incident. Dailing implicated himself, Paul Wayman, and a man named "Melvin" in the planning of the robbery of Barry's apartment. Dailing did not explain whether this Melvin was the defendant, Melvin "Butch" Schamma, or some other person. The defendant had been connected to Wayman and was seen by witnesses at the party on the night of the incident. The defendant was brought to the police station for questioning on August 9, 1987.

A taped admission and oral admissions made by the defendant during questioning were introduced into evidence. The substance of these admissions was that the defendant and Wayman attended Mudd's party on the night of the incident. The defendant and Wayman drank 12 to 13 beers and were "drunk." The defendant also smoked marijuana at the party. Dailing also attended the party and at some point approached Wayman and the defendant and said that the woman upstairs had a lot of money. Dailing explained that he was going on a trip to New York and needed money fast. Dailing wanted their help in robbing Barry's apartment. The defendant walked away and Wayman and Dailing had a conversation. After a while, defendant walked back up to the two men and Wayman asked him to assist in

the robbery as a lookout. After this, the three men twice walked up the stairs of the apartment building, but retreated both times. The defendant was thereafter driven by Wayman to a bar, where he drank two to three more beers. Upon returning to Mudd's apartment building, Dailing approached them again and said, "Let's do it now." The three men then entered the front doors of the building and walked up the steps. The defendant stood at the top of the steps and watched Dailing lift Wayman up so that he could look through the transom above Barry's door. Defendant watched the staircase and the doors to see if anyone entered. He heard the sound of a door being pushed in, a woman screaming and a door being shut. He then heard a thud. Three to five minutes later, Dailing and Wayman exited Barry's apartment at a fast pace. Wayman and the defendant then exited the building, but Dailing did not. While driving away, Wayman told the defendant that Dailing "lost it." Wayman said that Dailing had grabbed Barry with one arm and put his hand over her mouth with his other arm. Dailing then pushed her down on the bed, face first, and subsequently rolled her off the bed onto the floor. Wayman stated that they looked for money but found none. Wayman told the defendant to "keep quiet" about the incident.

At the conclusion of the trial, the jury found the defendant not guilty of murder and guilty of home invasion and conspiracy. The court entered judgment on the verdicts. Defendant's post-trial motion was denied after a hearing. Thereafter, defendant was sentenced to concurrent terms of 20 years' incarceration in the Illinois Department of Corrections for home invasion and three years' incarceration for conspiracy. This appeal followed.

Defendant argues on appeal that the trial court erred in denying his motion to suppress certain statements he made to police officers during interrogations. Defendant's first argument is that the trial court's finding that his statements were given voluntarily is against the manifest weight of the evidence. At the conclusion of the hearing on the motion to suppress, the trial court found that *Miranda* warnings had been administered properly and that the officers' conduct during the interrogations did not amount to coercion. Further, in its written order denying the motion to suppress, the court memorialized its findings, stating, *inter alia*, "[T]he tapping on the chest of the defendant five to six times by Sheriff Robert Nall was not proper, should not re-occur, but was not of sufficient force or nature to constitute coercion nor to render the statements following this act involuntary." The defendant now challenges this ruling as erroneous.

"The fundamental principle governing the admission of confes-

sions is well known: the confession must be voluntary; otherwise it is totally inadmissible." (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 1044, 463 N.E.2d 1044, 1047.) The test to determine whether a confession is voluntary is whether it was made freely, voluntarily, and without compulsion or inducement of any sort (*People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408), or whether the accused's will was overborne at the time of the confession (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726). This determination depends upon the totality of the circumstances (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), and consideration must be given to both the characteristics of the accused and the details of the interrogation (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383). The State bears a heavy burden of showing the statement or confession was knowingly, intelligently, and voluntarily made. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Kincaid*, 87 Ill. 2d 107, 429 N.E.2d 508.) Where, as here, the trial court finds that the confession was voluntary, a reviewing court's inquiry is limited to whether that finding is contrary to the manifest weight of the evidence. *Prim*, 53 Ill. 2d 62, 289 N.E.2d 601; *Berry*, 123 Ill. App. 3d 1042, 463 N.E.2d 1044.

■ Defendant's argument focuses primarily upon the details of the interrogation. Specifically, defendant argues that his confessions were elicited through various methods of coercion and were therefore involuntary. Defendant's allegations of coercion pertain to: (1) the manner in which the police officers initially confronted him and asked him to come to the police station; (2) the circumstances surrounding his arrival at the station house; (3) the circumstances surrounding the initial interrogation; (4) the manner in which he was transported to the jail after the initial interrogation; and (5) the physical force used during the second interrogation. Defendant also contends that testimony established he was "educationally handicapped." In support of his argument, defendant cites to this court's opinion in *In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761.

Contrary to the defendant's assertions, the record amply supports the trial court's determination. The evidence presented by the State at the suppression hearing and at trial which refutes each of the defendant's allegations is as follows.

Regarding defendant's first allegation of coercion, six officers were present when the defendant was initially located and asked to

come to the police station. Deputy sheriff Ray Nebe explained at the suppression hearing that the officers had received information that the defendant had a car and was attempting to leave town. Further, Quincy police officer James Fitch explained that several cars were used at the time they located the defendant because the officers were in the process of locating other people for questioning. The officers asked the defendant to come to the station and he agreed to do so. He was not placed under arrest and according to the officers he was free to go both before and after he accompanied them to the station. The defendant himself testified that the doors of the squad car were not locked.

As to the defendant's second allegation of coercion, during the ride to the police station, the officers informed the defendant that his mother was already at the station. Officer Fitch testified that he saw defendant's mother at the station when they arrived. The officers maintained that the defendant never asked to see or speak to his mother.

■ Defendant's third allegation of coercion pertains to the initial interrogation session. Officer Fitch, Deputy Nebe, and the defendant were present for this interview. Prior to questioning the defendant, Fitch administered *Miranda* warnings. The defendant acknowledged that he understood his rights, signed the waiver of rights form, and agreed to talk to the officers. Nebe and Fitch both testified that the defendant had no difficulty understanding what was explained to him and carried on a normal conversation. The interview lasted approximately two hours, not three. Although the defendant was wearing no shirt, it was a hot day. Further, the defendant voluntarily submitted to fingerprinting and photographing and he signed a waiver form to that effect. According to the officers, no threats, promises or special methods of coercion were used during the interview. The officers also stated that the defendant was at all times free to go and he did not ask them to stop the interrogation. Nor did he ask to speak to an attorney.

■ With regard to the defendant's fourth allegation of coercion, after the initial interview, Fitch, Nebe, and possibly one other officer walked with defendant to the jail. Fitch explained to the jailer that defendant was not being booked, rather he was simply there for photographs and fingerprints. Fitch's testimony from the suppression hearing reveals that someone else was being processed when they arrived so Fitch asked the defendant to sit and wait. Fitch explained that the booking area where photographs were taken is through a locked door. There are two gates, one at the bottom of the stairs

where one enters the jail and another at the top of the stairs. The upper door was not shut but the downstairs door automatically locks. According to Fitch, the defendant could have said he wanted out of the gate and he would not have been refused. Fitch's trial testimony reveals that he did not keep defendant under constant surveillance. Once Fitch found out that Nall and Finney were talking to the defendant, he went home. When Fitch left, it was his impression that defendant was not under arrest.

■ The evidence pertaining to the fifth allegation of coercion reveals that while waiting to be photographed and fingerprinted, the defendant was approached by Sheriff Robert Nall. The defendant agreed to speak to Nall and they proceeded to the laundry area of the jail. Quincy police sergeant Robert T. Finney was also present and prior to questioning he asked defendant if he remembered being read his *Miranda* rights by Fitch. The defendant said he did remember. Finney asked the defendant if he still wanted to talk and he said he would. The defendant never asked to talk to an attorney or to some member of his family. Further, he never asked to stop the interview. The city officers had informed Nall that defendant had been "Mirandized" and Nall had seen the signed waiver.

Initially during questioning, the defendant was very withdrawn and did not want to pay attention. According to Nall, he would stare at the floor, as though it did not matter to him what the officers said. Nall asked the defendant to look at him, to not stare at the floor, and to pay attention to what Nall was saying. At one point, Nall was two to three inches from defendant's face and talked to him, trying to get him to pay attention. Nall testified that he was not yelling, or screaming but was using a strong tone of voice. According to Nall, he tapped or thumped on defendant's chest about five or six times with one finger and told him to look at him when he was talking to him. Nall stated it was more of a gesture than a show of force or threat. Nall testified that he was sitting down and leaning forward at the time and that he did not hit defendant hard enough to leave any marks. Finney stated that Nall had his index finger pointed out, talking to defendant in a stern fashion, and touched him on the left side of the sternum. Finney stated there was not enough force to leave marks. The interview lasted 20 to 30 minutes and Nall tapped the defendant's chest approximately 20 minutes after the interview started. Four officers who saw defendant's chest following the tapping testified that they did not see any marks on defendant's chest.

Based upon the foregoing evidence and other evidence presented in this cause, we conclude that the State sustained its burden of show-

ing the confessions were made voluntarily and were not coerced. It is true that the defendant's testimony conflicted with that of the officers. However, this court has recognized that the trial court is in the best position to judge a witness's credibility in hearing a motion to suppress evidence. (See *People v. Creamer* (1986), 143 Ill. App. 3d 64, 492 N.E.2d 923 (and cases cited therein).) Furthermore, the trial court need not accept the defendant's version of the circumstances in preference to other testimony. *People v. Pinkham* (1985), 139 Ill. App. 3d 554, 487 N.E.2d 707; *People v. Eckles* (1984), 128 Ill. App. 3d 276, 470 N.E.2d 623.

■ Defendant's remaining contention relates to the characteristics of the defendant, specifically his age and the fact that he is "educationally handicapped." It is well established that a defendant's age, education, mental capacity, emotional characteristics, and experience in criminal matters are factors which must be considered by the trial court in determining the voluntary nature of a confession. (*People v. Hester* (1968), 39 Ill. 2d 489, 137 N.E.2d 466; *Berry*, 123 Ill. App. 3d 1042, 463 N.E.2d 1044.) Although the defendant's subnormal mentality is a factor to be considered when determining the voluntariness of his confessions, it does not *ipso facto* render a confession involuntary as long as the defendant has the capacity to understand the meaning and effect of the confession. *Berry*, 123 Ill. App. 3d 1042, 463 N.E.2d 1044.

■ Despite defendant's contentions to the contrary, the record demonstrates that he had the capacity to understand the meaning and effect of the confessions. The defendant was 18 years old, had completed the tenth grade of school and could read and write. The officers that were present for the administration of *Miranda* warnings testified that the defendant carried on normal conversations and appeared to understand what was being explained to him. The record reflects that he was reasonably articulate during his testimony at the suppression hearing. Further, the trial court was aware of his limited intellectual capacity and had this opportunity to observe the defendant as he testified. Finally, the defendant had a prior misdemeanor conviction and had been given *Miranda* warnings in that case. Hence, defendant's limited mentality did not render his confession involuntary.

Finally, defendant's reliance upon *In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761, is misplaced. In *T.S.*, the respondent gave an unwarned oral confession which was followed by a warned written confession. The investigating officers admitted that the written confession was a "mere reiteration" of the unwarned oral confession. We

determined in *T.S.* that the respondent's unwarned oral statement was not voluntary or admissible in view of the absence of *Miranda* warnings accompanied by intimidating, coercive and deceptive atmosphere of the interrogation. In reaching this conclusion we examined the characteristics of the accused and the details of the interrogation, as we do herein. Unlike the instant case, there was a considerable amount of unrefuted evidence that the officers failed to properly administer *Miranda* warnings and used deliberately coercive and improper tactics in obtaining the respondent's statement. Accordingly, *T.S.* is readily distinguishable from the case at bar.

In sum, the totality of the circumstances here, including the fact that the defendant was twice administered full *Miranda* warnings and was reminded of the *Miranda* warnings on another occasion, indicates that the defendant's confessions were voluntary. Accordingly, the trial court's determination is not against the manifest weight of the evidence.

■■ ■ Defendant's next argument is that the trial court's finding that his statements were not the product of an illegal arrest is against the manifest weight of the evidence. In denying the motion to suppress, the trial court determined that defendant's arrest was not illegal. The court found, based upon the testimony presented at the suppression hearing, that the defendant was free to leave and was not under arrest until after the tape-recorded interview. The defendant argues on appeal that he was arrested without probable cause when police transported him to the police station and conducted various interrogations under circumstances in which a reasonable person would not have believed he was free to leave.

The State's initial contention is that the defendant has waived this issue by failing to raise it in his motion to suppress and post-trial motion. The State next argues that notwithstanding waiver, there is ample evidence to sustain the finding of the trial court that no arrest occurred until the defendant gave the tape-recorded statement.

As pointed out by the State, defendant's motion to suppress did not allege lack of probable cause to arrest. The absence of this allegation was noted by the prosecutor at the hearing on the motion to suppress. Similarly, defendant's post-trial motion failed to raise this issue. Accordingly, this issue has been waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The supreme court in *Enoch* has recently emphasized that both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during a jury trial.

Moreover, this issue has been waived for an additional reason.

Where a motion to suppress is based upon the voluntariness of a confession, the State bears the burden of showing the confession was knowingly, intelligently, and voluntarily made. (*In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761.) However, on a motion to suppress based upon a lack of probable cause to arrest, the initial burden of going forward with the evidence is on the *defendant*. (*People v. Lyles* (1985), 106 Ill. 2d 373, 478 N.E.2d 291, *cert. denied* (1985), 474 U.S. 859, 88 L. Ed. 2d 141, 106 S. Ct. 171; *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513, *cert. denied* (1986), 478 U.S. 1013, 92 L. Ed. 2d 727, 106 S. Ct. 3314.) The supreme court in *Hattery* held that when a defendant fails to present evidence in support of this allegation, the defense has failed to carry its burden of going forward with the evidence and its initial burden of proof. (*Hattery*, 109 Ill. 2d at 466, 488 N.E.2d at 519-20.) As stated above, this issue was not raised in defendant's motion to suppress. Nor was evidence presented by the defense in direct support of this issue. The defense called two witnesses at the suppression hearing: the defendant and defendant's mother, Linda Cleesen. Linda Cleesen's testimony pertained only to the red marks she allegedly observed on the defendant's chest. Her testimony had no bearing on this issue whatsoever. Arguably, selected portions of the defendant's testimony could be relevant to this issue. However, his testimony was mainly directed to the coercion issue. Further, although defense counsel made a brief argument in regard to this issue near the conclusion of the suppression hearing, this was only after the prosecutor noted that the issue had not been raised in the motion to suppress. Hence, we do not believe the defense sustained its burden of going forward with the evidence and its initial burden of proof.

We note, however, that even if the evidence presented by the defendant had been sufficient to preclude an application of the waiver doctrine under the latter theory, it was insufficient to provide an adequate basis for overturning the trial court's determination as manifestly erroneous. *People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941, *cert. denied* (1984), 469 U.S. 840, 83 L. Ed. 2d 81, 105 S. Ct. 142.

■■■ ■ Defendant's final contention is that the home invasion and conspiracy definition instructions were erroneous because the phrase "or one for whose conduct he is legally responsible" was inserted before each proposition. In support of his argument, defendant cites the committee note to Illinois Pattern Jury Instructions, Criminal, No. 5.03, Committee Note, at 16 (2d ed. Supp. 1987) (IPI Criminal 2d), which indicates that the phrase " 'or one for whose conduct

he is legally responsible' " should be inserted before the state-of-mind propositions in "the issues instruction for the offense charged." Defendant asserts that the committee note does not state that the phrase should be included in the definition instructions as was done here. Defendant also relies upon the supreme court's decision in *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746, wherein the court held that it is error to include accountability language in a definition instruction. The defendant acknowledges that there were no objections to the instructions at trial and that this issue was not included in his post-trial motion. The defendant maintains, however, that the plain error rule (107 Ill. 2d R. 615(a)) should apply because the error here involved crucial instructions on the ultimate issue in the case.

The State contends that the defendant has waived this issue by failing to object or proffer alternative instructions at trial and by failing to raise the issue in his post-trial motion. The State further argues that even in the absence of waiver, any error in the instructions was harmless.

Generally, a defendant waives any error contained in jury instructions if he does not object or proffer alternative instructions at trial and, ordinarily, issues not properly raised in a defendant's post-trial motion will not be considered on appeal. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) However, plain error or defects affecting substantial rights may be considered although they were not properly preserved for review. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Thurman* (1984), 104 Ill. 2d 326, 472 N.E.2d 414.

The State is correct in its assertion that the defense failed to object or proffer alternative instructions at trial. Moreover, this issue was not raised in the defendant's post-trial motion. Accordingly, any error in the instructions has been waived unless plain error occurred. (*Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) The alleged error in the instructions here concerns the inclusion of accountability language in the definition instructions of home invasion and conspiracy. The supreme court in *Terry* addressed this exact issue. The defendant in that case argued that the murder-definition instruction was erroneous because the phrase "or one for whose conduct he is responsible" was inserted before each of the state-of-mind propositions. The defendant there also relied upon the committee notes to IPI Criminal 2d No. 5.03. In deciding this issue the court stated:

"Instructions in criminal cases must be read as a whole. 'It is sufficient if the series of instructions, considered as a whole,

fully and fairly announce the law applicable to the respective theories of the People and the defense.' (*People v. Kolep* (1963), 29 Ill. 2d 116, 125[, 193 N.E.2d 753].) In addition to the challenged definition instruction, the trial court gave IPI Criminal No. 7.02 (2d ed. 1981), which properly defined the issues that the State must prove, beyond a reasonable doubt, in a murder case. The jury was also accurately instructed on the law of accountability. When considered and read as a whole, the instructions in this case fully and adequately informed the jury of the applicable law. We agree that it was error to include the accountability language in the murder definition; however, for the reasons related above, and because the facts of this case are uncontroverted and overwhelmingly demonstrate the defendants' guilt, we hold that the instruction did not constitute reversible error." (*Terry*, 99 Ill. 2d at 516, 460 N.E.2d at 750.)

Accordingly, the *Terry* decision demonstrates that it is error to include accountability language in a definition instruction, but that reversal is not necessarily required.

An application of these principles reveals that the error in the instructions in this case did not amount to plain error. As in *Terry*, the jury was accurately instructed on the law of accountability. In addition, the jury was given the proper issues instructions for home invasion and conspiracy (IPI Criminal 2d Nos. 11.22, 6.04). Thus, when read as a whole, the instructions fully and adequately informed the jury of the applicable law. Furthermore, the evidence in this case overwhelmingly demonstrates the defendant's guilt. Accordingly, the inclusion of the accountability language in the definition instruction did not constitute reversible error.

The judgment of the circuit court is affirmed.

Affirmed.

KNECHT and GREEN, JJ., concur.