THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL JOHNSON, Defendant-Appellant.

Fourth District   No. 4—92—0526

Opinion filed September 9, 1993.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant Michael Johnson appeals from his conviction of solicitation to commit first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—1(a), 9—1), conspiracy to commit first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—2(a), 9—1), and first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)). Defendant alleges the

trial court erred in (1) denying his motion to suppress a statement made to an undercover informant; (2) improperly admitting evidence of defendant's gang membership and the circumstances surrounding the death of a fellow gang member; (3) improperly admitting evidence defendant was a chief of security for the Black Gangster Disciples (BGD) and was of a violent character; (4) improperly admitting testimony regarding threats made by gang members to prison guards; (5) improperly providing the jury with five sets of instructions regarding first degree murder; and (6) improperly convicting him of conspiracy to commit first degree murder and solicitation to commit first degree murder in addition to first degree murder. We affirm defendant's conviction of first degree murder, and vacate the convictions of conspiracy to commit first degree murder and solicitation to commit first degree murder.

## I. Facts

The situation which culminated in the murder of Superintendent Taylor began on July 20, 1987. On this date two inmates, Billy "Zodiac" Jones and Kirk Williams, both BGD members, were being transferred from their cell at Pontiac Correctional facility (Pontiac) to segregation. In response to statements made by Williams, gang members yelled threats and BGD slogans. While being transferred from his cell, Jones died as the result of ingesting a bag of cocaine. In the following weeks, some BGD members were removed to segregation. The BGD became upset with the treatment they perceived they were receiving from the administration, and also blamed the administration for Jones' death.

Harry Martin, a BGD member working with the police, testified the BGD gang is organized like a corporation. A chairman of the board, co-chairman of the board, and board of directors are responsible for setting policy for the organization. Below the board of directors, there is an institutional coordinator and assistant institutional coordinator in each correctional institution. Below them are institutional coordinators of education, treasury, exercise and the United Front Organization (UFO). The UFO is the security arm of the BGD and the institutional coordinator of the UFO is commonly referred to as the chief of security. The chief of security in each institution is responsible for the operations of security in the institution. The function of the chief of security is to provide bodyguards for the board members, make sure certain gang members have weapons, and plan and direct the attacks on staff, other inmates, and individuals within the

gang. Subordinate to the chief of security are unit coordinators of chiefs of security for each cellblock or division of the institution.

Larry Hoover was the chairman of the board of directors. Mike Akins was the institutional coordinator, and Corwyn "Ketchup" Brown was the assistant institutional coordinator at Pontiac. Defendant was the chief of security at the Pontiac facility. David "Cap" Carter, a subordinate of defendant, was the chief of security for the south cellblock. Anthony Williams, Ike "J.R." Easley, and Roosevelt "Rodog" Lucas were BGD security officers.

After Jones' death, defendant and Carter instructed gang members regarding attacks or murders which were to be carried out against members of the prison administration. Specifically, defendant instructed Carter regarding an attack on Taylor. Carter instructed Easley and Lucas to murder Taylor. Easley and Lucas attacked Taylor with a shank and pipe; Taylor died from wounds suffered in the attack.

During the investigation of Taylor's death, Martin visited defendant in prison. Martin had a tape-recording device concealed on his person. Defendant was unaware Martin was working with the police. Rather, defendant believed Martin was an emissary from Hoover, leader of the BGD. During his conversation with Martin, defendant acknowledged he was the chief of security, and he was responsible for the attack on Taylor. Defendant stated the attack on Taylor was motivated mainly by a desire to retaliate against the administration for its treatment of BGD, and to demonstrate the strength of the BGD. Defendant acknowledged instructing Carter to coordinate the attack, but stated he (defendant) did not intend for Taylor to be murdered. Defendant intended for Taylor to be beaten on the head with a pipe until unconscious.

Defendant was charged with one count of conspiracy to commit first degree murder, three counts of solicitation to commit first degree murder, and five counts of first degree murder. Defendant filed a motion to suppress the statements he made to Martin, which was granted on fifth amendment grounds. The State appealed the trial court's ruling on the motion to suppress, and we reversed. (*People v. Johnson* (1990), 197 Ill. App. 3d 762, 766, 555 N.E.2d 412, 414.) On remand, defendant made an oral motion to suppress the statements on sixth amendment grounds. The motion was denied.

After a jury trial, defendant was convicted of three counts of solicitation to commit first degree murder, one count of conspiracy to commit first degree murder, and three counts of first degree murder. The trial court vacated the convictions of two of the counts of first

degree murder and two of the counts of solicitation to commit first degree murder. Defendant, who has a previous conviction for first degree murder, was sentenced to natural life in prison on the first degree murder conviction. Defendant was also sentenced to 30 years' imprisonment for solicitation to commit first degree murder, and 14 years' imprisonment for conspiracy to commit first degree murder. All three sentences were to be served concurrently with each other, and consecutive to the sentences defendant is currently serving. Defendant appeals.

## II. STATEMENT MADE TO UNDERCOVER INFORMANT

Defendant alleges the trial court erred in admitting a taped recording of a conversation between defendant and Martin, during which defendant made inculpatory statements regarding his involvement in the death of Taylor. Defendant alleges his statements were involuntary under the fourteenth amendment and obtained in violation of the sixth amendment.

■ Defendant has waived consideration of whether his statement was involuntary under the fourteenth amendment due to his failure to raise this contention in his motion to suppress. In *People v. Travis* (1988), 170 Ill. App. 3d 873, 879, 525 N.E.2d 1137, 1140, defendant filed a motion to suppress statements he made to police officers because he was not taken without unnecessary delay before a judicial officer, and because the statements stemmed from an unknowing and involuntary waiver of his rights due to his subnormal intelligence and the fact he was intoxicated, deprived of sleep, and threatened by the police. The trial court denied defendant's motion. (*Travis*, 170 Ill. App. 3d at 882, 525 N.E.2d at 1141.) On appeal, the defendant did not allege the motion to suppress should have been granted for the reasons specified in the motion to suppress, but for reasons which had not been raised in the motion to suppress. Specifically, defendant alleged by throwing a written interview form to the floor and stating he would not sign anything he indicated he wished to remain silent, and the police officer involved did not scrupulously honor this request. We noted defendant had waived this contention as it was not one of the grounds for suppression raised in his motion to suppress. *Travis*, 170 Ill. App. 3d at 883, 525 N.E.2d at 1142-43.

Similarly, in this case, defendant filed a motion to suppress based upon failure to comply with an overhear order. Defendant amended this motion to allege his statements were obtained in violation of the fifth amendment. On remand, defendant made an oral motion to suppress, adopting the argument of Carter, that the statements were ob-

tained in violation of the sixth amendment. However, defendant *never* alleged the statements should be suppressed because they were involuntary under the fourteenth amendment. Since this was not one of the grounds for suppression raised in defendant's motion to suppress, it has been waived.

Defendant has additionally waived consideration of whether the statements to Martin should have been suppressed on both fourteenth and sixth amendment grounds, due to his failure to bring these allegations to the court with sufficient specificity in his post-trial motion. In order to preserve an argument, for the purpose of appeal, from a jury trial, the challenge must be presented to the trial court not only at the motion to suppress stage, but it must also be included in the defendant's post-trial motion. (See *People v. Cleesen* (1988), 177 Ill. App. 3d 103, 114, 531 N.E.2d 1113, 1120, citing *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30.) A central purpose of this requirement is to give the reviewing court the benefit of the trial court's judgment on the specific allegation. (*People v. Irwin* (1965), 32 Ill. 2d 441, 443-44, 207 N.E.2d 76, 78.) Broad and general allegations in a post-trial motion are inadequate to advise the court of the challenge being raised, and are inadequate to preserve an issue for appellate review. *People v. Bailey* (1979), 77 Ill. App. 3d 953, 956, 404 N.E.2d 258, 260.

In *People v. Buckner* (1991), 219 Ill. App. 3d 307, 309-10, 579 N.E.2d 1166, 1168, the State argued in this court a defendant failed to preserve his contention the court erred in granting the State's motion *in limine*, barring defendant from introducing evidence of the victim's infection with the HIV virus. The defendant filed a post-trial motion alleging the trial court erred in preventing him from introducing this evidence, which he alleged to be relevant to the issue of self-defense. We determined these allegations were sufficiently specific, and the defendant had preserved his allegations of error for review. (*Buckner*, 219 Ill. App. 3d at 310, 579 N.E.2d at 1169.) In the present case, the *only* allegation in the post-trial motion related to the motion to suppress stated: "the court erred in admitting the tape recording of defendant's conversations even in the conspiracy counts." This allegation of error does not inform the court that defendant alleges the tape should not have been admitted because it was obtained in violation of his sixth amendment rights and under circumstances not comporting with the due process guarantees of the fourteenth amendment. In ruling on the post-trial motion, the trial court seemed to be under the impression the defendant alleged the tape was improperly admitted because it was obtained in a manner not comporting with

the overhear order, or because it was not relevant. Specifically, the court stated:

> "I authorized the overhear. When I did so, I believed that Mr. Martin would simply be a listener and would only be listening to information volunteered by whoever he was talking to. Instead, he did what amounted to a very accomplished acting job, proceeded to pump, pry and pull all kinds of information out of various defendants, including Michael Johnson.
>
> Based upon the case of People vs. Perkins in the Fifth District which had just been decided at the same time I was addressing this issue, I was compelled to hold that the statements by Mr. Johnson to Harry Martin acting undercover must be suppressed for failure to give Miranda warnings, that an inmate working for law enforcement acting undercover was acting as a police agent and was obligated under a 1960 U.S. Supreme Court ruling to give the same admonishments a police officer would give even though it would be ridiculous and no one would say anything as soon as they were told their Miranda right by somebody they thought was a friend or fellow gang member.
>
> That decision was reversed by the Fourth District who chose to disregard Perkins, in a very unusual move, and at the same time the U.S. Supreme Court took Perkins out of the Fifth District and reversed Perkins and changed the law, so that made, in my opinion, the key element in this case available to the prosecution for the purposes of trial and that key element was the tape recording of the conversation between Michael Johnson and Harry Martin and that for whatever additional information Anthony Williams added or anyone else, this is a case which hinged almost entirely on that tape and what was said on that tape by Michael Johnson and how much knowledge he indicated on that tape he had in the murder of Superintendent Taylor and what role he took in that.
>
> \* \* \*
>
> \*\*\* I recognize that the tape is critical and it took a change in the law by the U.S. Supreme Court during the course of the trial to make that tape admissible.
>
> That's what occurred. The tape is admissible. The jury listened to it and the jury heard Mr. Johnson's explanation of what that meant on the tape \*\*\*."

From the trial court's discussion of (1) Martin's behavior, which exceeded that expected by the judge when granting the overhear or-

der, (2) the *People v. Perkins* (1988), 176 Ill. App. 3d 443, 537 N.E.2d 141, rev'd (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394, discussion which involves fifth amendment rights, and (3) the trial court's assessment of the tape, the trial court may have believed defendant was alleging in his post-trial motion that the tape was obtained in a manner violating the overhear order, the tape was obtained in a manner violating his fifth amendment rights, or perhaps the tape was not relevant. However, there is no indication in the trial court's discussion of the tape that the trial court understood the defendant to be alleging the tape was obtained in violation of defendant's sixth amendment rights, or in a manner not comporting with the due process requirements of the fourteenth amendment.

Thus, defendant's fourteenth amendment argument had been waived due to his failure to *ever* raise that issue in the trial court, and his failure to specifically raise it in a post-trial motion. Defendant's sixth amendment argument is waived due to defendant's failure to specifically raise it in his post-trial motion. However, we additionally note both arguments would fail if considered on their merits.

■ Defendant's fourteenth amendment argument would fail if considered on its merits. By virtue of the due process clause, " 'certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.' " (*People v. Easley* (1992), 148 Ill. 2d 281, 314, 592 N.E.2d 1036, 1050, quoting *Miller v. Fenton* (1985), 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449.) The voluntariness of a statement under the fourteenth amendment depends on the absence of police overreaching. The inquiry is confined to the agent's conduct and whether that conduct was causally related to the defendant's confession. (*Easley*, 148 Ill. 2d at 312, 592 N.E.2d at 1049.) In *Easley*, the supreme court determined the ruse devised by the police to elicit Easley's statement was so incompatible with the guarantees of the due process clause and to a civilized system of justice as to justify the conclusion that its further use must not be permitted. *Easley*, 148 Ill. 2d at 318, 592 N.E.2d at 1052.

In his conversation with Easley, Martin represented himself as an emissary from an attorney allegedly retained to represent Easley. Martin obtained Easley's confession by assuring him it was being obtained for the attorney's information. (*Easley*, 148 Ill. 2d at 318, 592 N.E.2d at 1052.) The supreme court reasoned that other than the relationship between a doctor and his patient, a clergy and a layman, or that between spouses, no relationship is accorded more privilege in

the eyes of the law than the relationship between an attorney and a client. (*Easley*, 148 Ill. 2d at 315, 592 N.E.2d at 1051.) The present case is distinguishable from *Easley*. Unlike the representations made by Martin in *Easley*, in his conversation with defendant here Martin *did not* represent himself as an emissary from an attorney. Martin's passing references to an attorney in his conversation with defendant were insufficient to cause defendant to reasonably believe Martin was speaking to defendant in order to obtain information for an attorney. Moreover, defendant made several inculpatory statements to Martin *before* Martin made any reference to an attorney. Under the circumstances of this case, we do not find defendant's statement to Martin was involuntary under the due process clause of the fourteenth amendment.

■ We also reject defendant's contention that his statements to Martin were obtained in violation of his sixth amendment rights. The trial court's determination on a motion to suppress evidence will not be overturned unless it is manifestly erroneous. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 212, 461 N.E.2d 941, 942; *Cleesen*, 177 Ill. App. 3d at 115, 531 N.E.2d at 1120.) In *Easley*, the Illinois Supreme Court ruled on the issue of suppression of similar evidence on sixth amendment grounds. (*Easley*, 148 Ill. 2d at 319, 592 N.E.2d at 1052-53.) In *Easley*, the supreme court determined statements made by Easley to Martin prior to being indicted for Taylor's murder were not obtained in violation of the sixth amendment right to counsel, because the right to counsel had not attached. Defendant's statements to Martin were also made prior to his indictment for the murder of Taylor. Accordingly, under the supreme court's ruling in *Easley*, we *must* conclude the statements were not obtained in violation of the sixth amendment.

III. Defendant's Gang Membership; Death Of Fellow Gang Member

Defendant alleges evidence of his membership in the BGD and evidence that Taylor was killed by the BGD to avenge the death of Billy "Zodiac" Jones, a BGD, as well as in retaliation for other actions by the administration was improperly admitted. Defendant alleges the connection between Jones' death and Taylor's murder was tenuous and the evidence complained of was more prejudicial than probative.

Defendant has waived consideration of these issues due to his failure to raise them in his post-trial motion. Defendant's arguments would also fail if considered on the merits.

There may be a prejudice against street gangs; however, evidence regarding gang affiliation need not be excluded if it is otherwise rele-

vant and admissible. Evidence indicating defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to prove motive for an otherwise inexplicable act. Such evidence, however, is only admissible where there is sufficient proof such membership or activity is related to the crime charged. (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907.) In *Smith*, defendant was charged with the killing of a Pontiac correctional officer outside of a Chicago bar. Shortly before the killing, a companion of defendant's was seen talking to Treadis Murray, outside the bar while defendant was in the bar, as was the victim. (*Smith*, 141 Ill. 2d at 48, 565 N.E.2d at 902.) Defendant was talking to Murray at the time of his arrest, several days later. (*Smith*, 141 Ill. 2d at 51, 565 N.E.2d at 904.) One witness testified Murray was the leader of the King Cobra Street gang. (*Smith*, 141 Ill. 2d at 48, 565 N.E.2d at 902.) Defendant had once been seen at Murray's apartment. (*Smith*, 141 Ill. 2d at 59, 565 N.E.2d at 907.) The State theorized defendant was a member of the King Cobra Street gang and the killing of the correctional officer was an assassination carried out on behalf of Murray and the King Cobras in retaliation for the correctional officer's intolerance of gang activity in prison. (*Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) Other than evidence that the defendant had been seen talking to Murray, the State presented no evidence that defendant was a member of the King Cobras Street gang. The State additionally presented no evidence that defendant knew his victim was a correctional officer, the correctional officer was intolerant of gang activity in prison, or the correctional officer had intervened in a fight between Murray and another inmate several years earlier when Murray had been incarcerated in Pontiac. Accordingly, the court found there was insufficient evidence to tie the alleged motive to the defendant and the evidence of gang membership was, therefore, more prejudicial than probative. *Smith*, 141 Ill. 2d at 59, 565 N.E.2d at 908.

Similarly, in *Easley,* the supreme court ruled evidence of Easley's membership in the BGD and of the BGD plot to kill Taylor was improperly admitted, although the admission of such evidence was harmless error. (*Easley*, 148 Ill. 2d at 330, 592 N.E.2d at 1058.) In *Easley*, no evidence was presented indicating any meetings had taken place, during which the BGD members had discussed murdering a member of the Pontiac staff in retaliation for Jones' death. Nor did the State introduce evidence that Easley had been present at these meetings, if they had in fact occurred. Although a witness testified inmates said they were going to retaliate for Jones' death, these statements were

not linked in any way to the BGD or to defendant. The court noted when the State undertakes to prove facts which it asserts constitute a motive for the crime charged, it must be shown the accused knew of those facts. The court found the evidence introduced was woefully insufficient to allow introduction of the gang evidence. *Easley*, 148 Ill. 2d at 329, 592 N.E.2d at 1057-58.

Conversely, in *People v. Lucas* (1992), 151 Ill. 2d 461, 480, 603 N.E.2d 460, 468-69, the supreme court, under a set of facts similar to those in the present case, distinguished *Easley*, and found evidence of Lucas' gang membership and evidence in support of the State's theory to have been properly admitted. Lucas did not deny his membership in the BGD, and evidence was presented that Lucas was present at a BGD meeting where plans to retaliate against the administration were discussed. Accordingly, the supreme court concluded it was unreasonable to argue Lucas' membership in the BGD was of no probative value. The court additionally found evidence of the BGD activities was also probative and relevant. *Lucas*, 151 Ill. 2d at 480, 603 N.E.2d at 468-69.

█ In the present case, both correctional officers and inmates testified defendant was a member of the BGD. This testimony was confirmed by the tape of defendant's conversation with Martin. In his conversation with Martin, defendant acknowledged "Mike," who had been previously identified as Mike Akins, was the institutional coordinator, "Ketchup" was the assistant institutional coordinator, and he was the chief of security. Although the organization in which the named individuals held these positions was not specified in the conversation, at trial defendant testified he believed Mike Akins to be the leader of the BGD, and also believed Ketchup was affiliated with the BGD.

There was also sufficient evidence that defendant's membership in the BGD gang was related to the crime charged, and linking him with the motive theory advanced by the State. Anthony Williams, a BGD security officer, testified he attended a meeting of 30 BGD security members, which was held several weeks before Taylor's murder. At this meeting, Johnson told the security members he was tired of the way correctional officers had been treating BGD gang members, and it was time for BGD gang members to start killing members of the administration. After the meeting of 30 security members, Johnson held a meeting attended by David "Cap" Carter, Ike "J.R." Easley, Roosevelt "Rodog" Lucas, Kevin "K-dog" Clark, and Anthony Williams. At this meeting, defendant stated he wanted gang members to kill Captain Whitaker, Sergeant Stram, Lieutenant McBurney, and

several other correctional officers. Carter wanted Taylor to be killed. However, defendant stated Taylor had been warned and would be given a chance to respond to the warning before a decision would be made regarding whether to kill him. Carter stated Anthony Williams, Lucas, and Clark were to kill Whitaker. Defendant instructed these three to use a knife and a pipe, and after Whitaker was killed, to leave the weapons in the office and close the door. Defendant also stated someone in the administration had to die in order for Jones' death to be avenged.

Anthony Williams testified that, a couple of weeks later, on the morning of Taylor's death, he was with Carter. Carter told Anthony Williams to look out the window. Anthony Williams looked, and saw "Mr. G.," another BGD, being handcuffed and taken into segregation. Carter stated he was "tired of this shit, these officers constantly fucking over the brothers. We're going to start hitting some of them. They getting hit today." Carter then instructed Anthony Williams to remain on the gallery, and that he (Carter) would go outside to talk to defendant. Anthony Williams saw Carter, defendant, Mike Akins, and several other individuals talking in the yard. Anthony Williams was later called to Carter's cell to stand guard. Anthony Williams heard Carter instructing Lucas and Easley to kill Taylor. Lucas and Easley put on stocking hats. Lucas had a pipe and Easley had a knife. Anthony Williams saw Lucas and Easley enter and then run away from Taylor's office. After Lucas and Easley left Taylor's office, Anthony Williams saw Taylor walk out of his office and collapse.

Anthony Williams' testimony that defendant instructed gang members to kill Taylor was corroborated by defendant's statements to Martin. In his conversation with Martin, defendant stated:

"Johnson: I know everybody they mad about Zodiac.

Martin: Little Z, huh.

Johnson: Okay, but, you know, right after that we got the word to leave that there shit alone, leave that alone. Okay, right after that they whooped one of the folks in the dining room. They just gorillad [sic] him. And one of the committee members stopped a UFO from getting out of hand because, you know, we can't win in those dining halls, no how, so they stacked the deck. Then two days after that they whooped two more folks right out here on the crosswalk. They just getting carried away, right?

Martin: Uh huh.

Johnson: So, enough is enough. And now, see the thing is, they wasn't supposed to kill that man. They was just gonna use

some pipes. The Unit Coordinator of the UFO. You know, I ain't had any chance to talk with him since we been locked up.
\*\*\*

\* \* \*

Martin: I'm trying to figure out cause he gonna ask me all this shit cause he was fucked up when I left there last trip. Now he's saying to find out who called it. He said it ain't no major. He just wanted to know so I can get on top of them and make sure they straight. Obviously, they had a good reason, but he wanted to get a grip on this kind of shit.

Johnson: This is what I would say—I guess that's my responsibility, but like that's why I'm saying, you know, that they wasn't supposed to kill the man. Okay, but by me knowing how it goes, I mean, you know, I know exactly how that goes. I've had it coordinated for the UFO in the South House uppers and downers and east and west. Them there on the upper deck, their UFO coordinator is responsible for it. I instruct and make it clear, you know. But then, you know, like just use pipes, like make sure you all get a clean getaway. Well, this is on the table for two weeks. They had two weeks trying to coordinate just how they was gonna do it—timing and all of that. And, uh, maybe they didn't intend for him to die, but he did. You know, that wasn't on the agenda.

\* \* \*

Johnson: I told him to just use the pipes. I gave him the whole week. I said now tell me exactly how you gonna do this. You know, he was gonna have a man on 8 gallery to distract the officers in the back. You know they got us barricaded in. You got to go through thirty gates to get off the gallery. They was going to distract the police on 8 gallery and turn the radio up loud ... turn that up loud and kill noise. And they gonna ... ski masks on ... Now what I was mainly concerned about was everybody getting away. We didn't want no casualty cause I explained that I know we can't win if every time we do something we get caught up. We want to get away. Don't worry about it, it will happen the way they intended. They had clothes they was gonna change into and everything. Cap showed me the spot on my neck where he said they was gonna hit him and make sure he was unconscious, you know, cause they don't want to leave him in there moving so they can get away. So this is all they probably had to do is try to keep him from moving on them. Hit him on the head.

Martin: Yeah, trying to knock him out?

Johnson: So the plan sounds good. I was concerned about the knock out part but, you know, it might not work. You got to keep on keeping on, but, you know, still that's how he explained it to me.

Martin: So it was okay with you?

Johnson: Yeah.

Martin: Okay, what was, uh ...?

Johnson: They was singling us out. See the administration is singling us out because we was just so many of us, you know, we so organized and they was trying our hand. See after Zodiac, right away they took away all the brothers that they, all the aggressive brothers, that they thought was gonna just as soon as they let us off lockup. Straight off, all them. Put them on seg, right? Then they took Tony and them out of the cell cause they was throwing cans and hot water and shit at these motherfuckers that was being held. That's just shit. All them, okay. Then they had another sweep that come back and got a few more. They come and take out J.R. cause he's the brother on the security. He's a good brother. Does strictly security. They get them cause they dirty. All the time they be shaking down everyday five cells in the morning and five at night. Sporadic at random. And they hit just us. Everytime they hit they find shanks. Okay, so they eliminating security knocking us all down so when they start whooping, the whoop on 'Black' in the dining room, the administration felt that we was at our weakest. They was trying our hand. We was trying to be cool, but they stacked the deck against themselves. Guess they fell. They was forcing us to do something cause they think we just got weak. They just singling us out, and they're whooping us. They ain't whooping nobody. But they're whooping us to see how we gonna react. Then when they whooped them two brothers on the crosswalk, that was the ultimate. Brothers was saying we let things go too far, and when I explained to Cap that them brothers that they took to seg those were some of our best good brothers. They think now that we at our weakest. And I said you gotta take care of business before one of them brothers come out of seg *** they gonna feel that they influenced it. And while we at our weakest, we gonna show him we're not weak. And this is the best time to get him while all them brothers is in seg already, out of the way, get him now."

According to defendant's statements to Martin, he (defendant) was responsible for "calling" the attack on Taylor. Defendant called the attack in retaliation for Jones' death, but also in response to the actions of the administration in the weeks following Jones' death. Defendant believed the administration "stacked the deck" against itself and forced the gang's hand. Defendant instructed "Cap" to plan an attack. According to Johnson's statement, he only intended for Taylor to be beaten with pipe and left unconscious, but did not intend for him to be killed. In light of this evidence, we believe the evidence of defendant's gang membership and the motive evidence was properly admitted.

## IV. DEFENDANT'S GANG POSITION

Defendant alleges the trial court erred in admitting evidence defendant was chief of security of the BGD "and had a violent character." Defendant has waived consideration of this issue due to his failure to raise it in his post-trial motion. However, any error in the admission of such evidence was harmless beyond a reasonable doubt.

Martin testified the chief of security is responsible for providing bodyguards to the board members, ensuring certain gang members have weapons, and ensuring attacks on other individuals are carried out. The chief of security is chosen based on loyalty to the organization and the sort of cases they have. Specifically, Martin testified:

"If you have got somebody with 35, 40, 50 years incarcerated and they have been a member of the organization for a very long time, they have murder cases or assault cases or weapons cases of some kind, then they would be prime candidates for this staff."

In *Lucas*, the supreme court found Martin's testimony describing the qualifications and responsibilities of the UFO was nothing more than an attempt by the State to portray Lucas as a person capable of murdering Taylor and thereby persuade the jury his propensity for violence made it likely he was guilty as charged. (*Lucas*, 151 Ill. 2d at 484, 603 N.E.2d at 470.) The State admitted it sought admission of evidence the role of the UFO was to carry out violence on behalf of the BGD on the grounds it was probative of whether Lucas was the type of gang member that would be involved, from his gang standpoint, in an attack on the administration.

■ We believe, in this case, the evidence that defendant was the chief of security of the BGD, and the ability of the chief of security to order other gang members to commit attacks, is distinguishable from the evidence introduced in *Lucas*. In the present case, the evidence

was not admitted to demonstrate defendant was the type of individual likely to commit violence. Rather, the evidence was admitted to explain the authority defendant had over Carter, and ultimately, Lucas and Easley. Defendant acknowledged to Martin he was the BGD chief of security at Pontiac. Defendant's position as chief of security and the evidence a chief of security was able to order or "call" an attack on a correctional officer or other individual was properly admitted.

The evidence of the qualifications of a chief of security was improperly admitted. This testimony, like the testimony of the qualifications of a security member introduced in *Lucas*, had no purpose other than to persuade the jury defendant was a violent criminal, and was therefore likely to have ordered the attack on Taylor in the present case. However, in light of the other evidence in the trial, the admission of this evidence did not deny defendant a fair trial. *Lucas*, 151 Ill. 2d at 484, 603 N.E.2d at 471.

### V. Gang Threats To Guards

■ Defendant argues the trial court erred in admitting correctional officer Danny Jarrett's testimony regarding statements made by gang member Kirk Williams when he and Jones were being removed from their cell, statements made by other inmates at this time, and testimony threats were made by BGD to Jarrett and other members of the administration. The State's theory was the attack on Taylor was in retaliation for the death of Jones, and the treatment generally of the BGD by the administration. The supreme court decided a similar issue in *Lucas*, and determined evidence regarding the threats Jarrett received or heard was improperly admitted, but there admission was harmless error. (*Lucas*, 151 Ill. 2d at 478, 603 N.E.2d at 467-68.) As the court noted in *Lucas*, the threats did not go to the heart of the case. Whether the jury believed Williams made a speech against the administration and Jarrett was threatened by a BGD member, it still had to decide whether defendant was involved in the planning and ordering of Taylor's death. (See *Lucas*, 151 Ill. 2d at 478, 603 N.E.2d at 468.) There was overwhelming evidence connecting defendant with the BGD and evidencing defendant's role in ordering the murder of Superintendent Taylor. Thus, even without Jarrett's testimony, defendant would have been proved guilty beyond a reasonable doubt.

### VI. Jury Instructions

Defendant argues the trial court erred in giving the jury five instructions on the issue of first degree murder, one for each count of

murder. We agree with defendant's contention that only one issues instruction should have been provided to the jury. However, we find defendant failed to preserve this issue for review, and the error does not rise to the level of plain error.

The Illinois Supreme Court rules provide the Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (IPI Criminal 2d) shall be used in a criminal case unless the court determines it does not accurately state the law. (134 Ill. 2d R. 451(a).) IPI Criminal 2d Nos. 7.01A and 7.02A (Supp. 1989) make clear the jury should be instructed with only *one* definitional instruction and *one* issues instruction regarding the offense of first degree murder, no matter how many counts of first degree murder might be charged against the defendant. (*People v. Presley* (1992), 230 Ill. App. 3d 77, 95, 595 N.E.2d 606, 618 (Steigmann, J., specially concurring).) Moreover, the Illinois Supreme Court has approved the use of a general issues instruction for first degree murder although there are multiple counts of murder charged. This is because, under Illinois law, there is only *one* offense of first degree murder, no matter how many alternative ways the State may choose to charge a defendant with the offense of first degree murder. *People v. Johnson* (1992), 149 Ill. 2d 118, 156-57, 594 N.E.2d 253, 272; see *People v. Scott* (1992), 148 Ill. 2d 479, 554-55, 594 N.E.2d 217, 249.

▆ In the present case, the trial court did not make a determination that the IPI instructions did not accurately state that law. By deviating from the language of the IPI instructions, the trial court violated the mandate of Rule 451(a).

It is well settled that failure to object to a jury instruction waives the issue. (*People v. Booker* (1992), 224 Ill. App. 3d 542, 555, 585 N.E.2d 1274, 1284.) Defendant argues failure to properly instruct the jury constitutes plain error because the issues instructions presented to the jury were erroneous and confusing. The plain error exception to the waiver rule permits a reviewing court to consider issues waived for the purposes of review when the evidence in a criminal case is closely balanced, or the error is so fundamental and of such magnitude that the accused was denied a fair trial. (*Lucas*, 151 Ill. 2d at 482, 603 N.E.2d at 469; 134 Ill. 2d R. 615(a).) Although defendant has alleged the instructions were erroneous and confusing, he has provided no argument in support of this contention, which itself results in waiver (134 Ill. 2d R. 341(c)(7)). Our review of the instructions given by the trial court indicates the instructions were not erroneous and confusing. On the contrary, they accurately state the law, and, although differing in format from IPI Criminal Nos. 7.01A and 7.02A (Supp. 1989), contained the same language employed in IPI Criminal

Nos. 7.01A and 7.02A (Supp. 1989). Moreover, the evidence in the present case was not factually close. Rather, the evidence overwhelmingly indicated defendant, as the chief of security for the BGD, orchestrated and ordered the attack which resulted in the death of Superintendent Taylor. An error is harmless and not subject to plain error if the defendant has not been denied any substantial right. See *Enoch*, 122 Ill. 2d at 185-90, 522 N.E.2d 1129-31; *People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856, 858.

Although we agree the trial court erred in giving multiple instructions of the issue of first degree murder, we find defendant waived this issue by his failure to object at the time the instructions were given and in a post-trial motion. The instructions accurately advised the jury of the law and were not confusing, and the evidence of defendant's guilt was overwhelming. There was no plain error.

## VII. MULTIPLE CONVICTIONS

Defendant alleges, and the State concedes, he was improperly convicted of conspiracy to commit first degree murder and solicitation to commit first degree murder in addition to first degree murder.

■ Under Illinois law, a defendant cannot be convicted of both the inchoate and principal offense. Conspiracy to commit murder and solicitation to commit murder are inchoate offenses. Where a defendant has been convicted of both the principal and inchoate offenses, the proper procedure is to vacate the conviction and sentences with respect to the inchoate offenses. See *People v. Hill* (1980), 78 Ill. 2d 465, 476, 401 N.E.2d 517, 523; *People v. Crews* (1989), 191 Ill. App. 3d 228, 234-35, 547 N.E.2d 580, 584-85; *People v. Davidson* (1987), 160 Ill. App. 3d 99, 117, 514 N.E.2d 17, 29-30.

This issue should have properly been disposed of in the trial court. The obligation to vigorously represent a defendant does not wane after the defendant has been convicted by the jury. In the present case, the trial court stated it was uncomfortable sentencing defendant with respect to the inchoate convictions as well as the conviction for first degree murder. Although the trial court requested counsel to provide citation to authority, no authority was provided by either defense counsel or the State's Attorney. Rather, defense counsel merely stated sentences for both the convictions for the inchoate offenses and the first degree murder were impermissible, while the State's Attorney stated such sentences were permissible. Had either party provided the requested authority to the trial court, this matter would have been properly addressed.

We vacate defendant's convictions and sentences with respect to the conspiracy to commit first degree murder and solicitation of first degree murder offenses.

## VIII. CONCLUSION

For the foregoing reasons, defendant's conviction of first degree murder is affirmed. Defendant's convictions of conspiracy to commit first degree murder and solicitation of first degree murder are vacated.

Affirmed in part; vacated in part.

STEIGMANN, P.J., and McCULLOUGH, J., concur.