2021 IL App (1st) 182424-U

No. 1-18-2424

Order filed September 2, 2021

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 13552 (02) |
| | ) | |
| VENTREAL LEWIS, | ) | |
| | ) | Honorable Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, Presiding |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justices Gordon and Reyes concurred in the judgment of the court.

**ORDER**

¶ 1    *Held*:  The record is insufficient to establish that counsel was ineffective despite failing to elicit evidence to support the misidentification theory counsel promised in his opening statement. Counsel was not ineffective for refraining from arguing for a directed finding on two counts when the State was later permitted to reopen the proofs. Circuit court did not abuse its discretion in sentencing 22-year-old adult offender without giving special consideration to his youth. Nor did the circuit court abuse its discretion in imposing prison terms above the minimum for each offense. However, the circuit court abused its discretion in imposing consecutive sentences.

¶ 2    Ventreal Lewis appeals his convictions and sentence for armed robbery with a firearm, aggravated discharge of a firearm, and unlawful use of a weapon by a felon (UUWF). Lewis claims

his trial counsel was ineffective for failing to investigate and support the misidentification theory he argued in his opening statement when the evidence at trial did not bear that out. He also claims the circuit court abused its discretion by sentencing him to an aggregate term of 33 years in prison without adequately considering his youth and personal history. We ordered supplemental briefing on whether the court properly imposed consecutive sentences as that issue was included in Lewis's motion to reconsider sentence and was raised by his codefendant on appeal.[1] The parties submitted briefs asserting opposing positions on that issue.[2]

¶ 3                                              I. BACKGROUND

¶ 4            Codefendants Ventreal Lewis and Nicholas Walker were tried jointly before the bench. As to Lewis, the State proceeded on one count of armed robbery with a firearm, one count of aggravated discharge of a firearm, one count of aggravated assault, and one count of UUWF. In his opening statement, Lewis's counsel argued that the State's case against Lewis relied solely on his identification by the victim, Allen Ross, as one of the men who robbed him. But the identification was not reliable, according to counsel, because Ross identified Lewis only after later viewing a social media site connected to Walker and, more significantly, Ross identified a third person in a show-up on the night of the robbery.

¶ 5            Allen Ross testified that he drove to his aunt's house in Dolton, Illinois in the late evening of June 1, 2014, to pick up an air mattress. He parked in front of his aunt's home but left the windows down and the car running while he went inside. He spoke briefly with his aunt and her boyfriend before deciding to return to his car, as he noticed two men walk by across the street. Ross walked toward his car carrying the air mattress box over one shoulder and holding his cell

---

[1]Codefendant Nicholas Walker was tried simultaneously but filed a separate appeal, which we addressed in a separate order. See *People v. Walker*, 2021 IL App (1st) 181506-U.
[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

phone in his other hand, which he was using to talk to his girlfriend, Michele Nettles. When he reached the sidewalk, he noticed that the two men had crossed the street and were approaching him from either side. They both repeatedly stated, "What you got?" Ross then saw the man to his right, who he identified in court as Lewis, holding a chrome revolver. The hood of Lewis's sweatshirt covered the back of his head, but Ross could see his face and hair as they stood under a streetlight. Ross replied that he had nothing, only the box he was holding. Lewis reached into Ross's pocket and pulled out his keys. At that point, Lewis was so close to Ross that they could "share the same breath." Lewis then opened the passenger door of Ross's car. Ross wanted to fight him off, as everything he owned was in his car because he was in the process of moving. As Ross approached Lewis, the other individual who Ross identified in court as Walker, pulled a black revolver and said, "get back." Walker took the box and Ross's cell phone. Ross put his hands up. Walker and Lewis, seeming to ascertain that Ross had nothing they found worth stealing, started arguing with each other.

¶ 6        Ross ran back inside his aunt's home and found her calling the police. Looking outside, Ross then observed Walker and Lewis run down the street. Ross decided to follow them in his car. Walker and Lewis ran to a blue Chevrolet Impala parked a short distance away. Lewis entered the driver seat and Walker the passenger seat. They drove off as Ross pursued them. After a few turns, Ross saw and heard 4 or 5 shots fired from the passenger seat of the blue Impala. The chase continued and a marked police vehicle joined the pursuit by getting behind the blue Impala but ahead of Ross's car. Eventually, the blue Impala pulled to the right side of the street and came to a stop and the police vehicle stopped just behind it. Ross pulled to the left side of the street and stopped two car lengths behind. Ross saw Walker and Lewis run on foot from the blue Impala in opposite directions.

¶ 7     Additional police officers arrived at the location where the cars had stopped. Ross then used an officer's phone to call Michele. Michele asked Ross to call her back on their daughter's phone as she was still connected to his phone that had been taken in the robbery. A while later, Michele came to the scene and handed her phone to the police. Ross walked with officers down a nearby alley, where he saw a canine officer with their dog enter a garage and then emerge with Walker. Ross identified Walker to police as one of the men who robbed him. At that point, Walker told Ross, "this was nothing, he'll be out soon, look him up on Facebook" and gave his name, Nick Walker. Police searched the garage and recovered Ross's cell phone.

¶ 8     While still at the scene where the cars had stopped, an officer named Allbritton "pulled back up" in a police vehicle with an individual and asked Ross, "Is this the second guy?" Ross observed that the individual had longer hair and a lighter complexion than the second robber, so he told police that the individual was not the other robber.

¶ 9     The next day, June 2, 2014, Ross went to a Dolton Police Department station and identified Walker in both a photo array and a lineup. He also viewed a separate lineup but did not identify any of the participants as one of the men who robbed him.[3] While at the station, Ross used Michele's phone to view Walker's Facebook page. Upon viewing Walker's photographs, he recognized Lewis and informed the police. The next day, Ross identified Lewis in a photo array and, on June 18th, Ross identified Lewis in a lineup.

¶ 10    Michele[4] testified she was speaking with Ross by phone on the night of June 1, 2014. She heard Ross depart from his aunt's house. Moments later she heard Ross say, "What's up bro?" A different voice responded, "What you got?" and "Run your pockets." Michele then heard Ross say

---

[3]Admitted exhibits indicated neither Walker nor Lewis were participants in this lineup.
[4]Michele and Allen married in between the time of the robbery and the trial. She went by the name Michele Ross at the time of trial.

he did not have anything. Another voice said, "Is this your car?" She then heard a scratching noise for some time, followed by car doors opening and closing. That was followed by the sound of a car struggling to start. Eventually, a running engine could be heard, and a voice said, "Drive, drive he behind us." Michele continued to listen and was able to make out two people talking to each other and arguing about which way to turn. Michele heard gunfire and then what sounded like one side of a conversation in which the speaker was telling another person they would report their car stolen tomorrow but needed to get somewhere safe. Over a loudspeaker, she heard police direct the green Monte Carlo (Ross's car) to stop chasing. She heard someone say they will pull over in a minute and run. Michele then heard the scratching noise again.

¶ 11    A short time later, Michele received a call from Ross and drove to meet him. After arriving, she handed her phone to a police officer and explained it was on the line with Ross's phone. Later, she saw a person being brought to an ambulance. He said to look him up on Facebook, his name was Nick Walker, he will be out, and "this [is] what [I] do."

¶ 12    Dolton Police Officer Patrick Carr testified he was on patrol in a marked squad car around 11:40 p.m. on June 1, 2014, when he received a call of an armed robbery in progress. As he headed toward the reported location, he saw two cars, a blue one followed by a green one, coming in the opposite direction at high speed. The cars turned left in front of Officer Carr. The passenger of the blue car pointed a handgun at Officer Carr. Through a series of turns, Officer Carr was able to get behind the blue car and activated his lights and sirens. The blue car eventually stopped, and the occupants "bailed," running in different directions. Officer Carr stopped his vehicle and exited. Allen Ross arrived driving the green car that had been following.

¶ 13    Officer Carr learned that Ross's cell phone had been stolen. He had Ross's phone "pinged" and went with a canine unit to search its location. The canine officer went into a garage and

emerged with Walker, who was in handcuffs. An ambulance was called as Walker had been bitten on the arms during his apprehension. Officer Carr went into the garage and found Ross's cell phone. Officer Carr returned to the blue Impala and searched it. There, he observed two handguns underneath the front passenger's seat, one chrome and one black.

¶ 14    Dolton Police Detective Dave Crudup testified he went to the location of the abandoned blue Impala. Detective Crudup took custody of two revolvers from under the front passenger seat. One was a stainless steel .38 caliber Smith & Wesson. The other was a .22 caliber blue steel (black) Regent revolver. The Regent revolver contained four live rounds and four discharged cartridge casings. Detective Crudup explained live rounds still contain a bullet while discharged cartridge casings remain after a bullet is fired. The Smith & Wesson revolver had four live rounds, but no empty cartridge casings. He identified both revolvers, live rounds, and discharged casings in court.

¶ 15    After Detective Crudup's testimony, the State rested. Walker's counsel moved for a directed finding on "all offenses" but only offered a specific argument for the aggravated assault charge. Lewis's counsel joined in the motion and added a specific argument on the aggravated discharge of a firearm count arguing no evidence showed that Lewis discharged a firearm. The court granted the motions and entered a judgment of acquittal for the aggravated assault charge only but denied the motions as to the remaining counts.

¶ 16    In his defense, Lewis called Sergeant Allbritton of the Dolton Police Department. Sergeant Allbritton testified that, as part of the investigation, officers from the Riverdale Police Department brought a subject for Ross to view while Ross sat in the rear of Sergeant Allbritton's squad car. Sergeant Allbritton did not remember the subject's identity or whether Ross identified the subject as one of the robbers.

¶ 17　　　　Neither defendant elected to testify. The court then asked the State if it wished to present any evidence in rebuttal. The State sought to admit certified copies of the defendants' prior felony convictions. The court asked if the State was seeking to reopen its case in chief to present those exhibits because they were not rebuttal evidence. The State answered "yes," and the court allowed the exhibits to be admitted in the State's reopened case in chief over the defendants' objections.

¶ 18　　　　In closing argument, Lewis's counsel argued the only evidence implicating Lewis was Ross's testimony: police did not find him at the scene, no weapon was linked to him, and he was arrested sometime later after a "bizarre" identification on Facebook. Counsel submitted that Officer Carr testified Ross identified a person named Christopher Smith in a show-up as one of the men who robbed him, and Smith was arrested and placed in a lineup. Lewis's counsel further argued that Sergeant Allbritton's lack of memory regarding the identification of a third person was not believable.

¶ 19　　　　In its ruling, the court stated that it found Allen Ross "very credible" and noted he had a "very good opportunity to observe the faces of the people that robbed him" and consistently identified the defendants in lineups and at trial. The court also found that Michele Ross's testimony corroborated that gunshots were fired from the defendants' car. The court found Lewis guilty of armed robbery with a firearm, aggravated discharge of a firearm, and two counts of UUWF.

¶ 20　　　　Later, Lewis filed a motion for new trial or acquittal. The motion argued that Allen Ross was not credible because his denial that he identified a third person in a show-up was contradicted by testimony from police officers and the fact that the same person was placed in a lineup the next day. In arguing the motion, counsel reiterated that position and added that Lewis was arrested only after Ross's mother viewed him on a social media post. The court again noted that Ross had a good

opportunity to view the offenders and found his identification credible. Accordingly, the court denied the motion for new trial or acquittal.

¶ 21    At sentencing, counsel argued for the minimum sentence of 21 years and described the crime as "an aberrant act, a single individual mistake" for Lewis. Counsel noted Lewis had a supportive family, graduated from high school, and had only one prior felony conviction: a robbery for which he received a term of probation. He further noted that Lewis spent his time in custody productively, earning certificates and tutoring others. Moreover, counsel argued that these factors, taken with the "already lengthy" mandatory minimum, make the minimum sentence appropriate. The court remarked that Lewis's background did not show the "very fractured upbringing" the court would expect from the violence attendant to this crime. Rather, he had a "solid family," finished high school, and had a good job in construction for a time. This led the court to question, "How are we here today?" The court stated it was troubled that Lewis had escalated from a robbery in 2011 to this armed robbery, which involved a "truly violent confrontation." The court then sentenced Lewis to 10 years in prison for armed robbery plus a 15-year mandatory firearm enhancement, followed by a consecutive 8-year term for aggravated discharge of a firearm. The court stated that it was imposing consecutive sentences because "[p]ulling a gun on somebody is one thing; shooting a gun is entirely different." The court also merged one UUWF count into the other and imposed an 8-year term to run concurrently with the others.

¶ 22    Lewis filed a motion to reconsider sentence. The motion requested that the court reduce the sentence to the minimum term of 21 years because (1) Lewis only had one prior conviction, (2) the sentencing hearing demonstrated Lewis's ability for rehabilitation, and (3) a consecutive sentence for aggravated discharge of a firearm was unduly harsh. At a hearing on the motion, the court reiterated that Lewis "graduated from simple robbery to armed robbery" and commented,

"[r]obbing somebody with a firearm is one thing, but when you fire the firearm that's another thing." The court then stated, "I believe that a consecutive sentence is necessary to protect the public from further criminal conduct of the Defendant," and denied the motion.

¶ 23 We allowed Lewis's late notice of appeal. Before this court, Lewis claims he was denied the effective assistance of counsel where his counsel failed to adequately investigate or support the misidentification theory and for failing to move for a directed verdict on the UUWF counts. In addition, Lewis claims the trial court abused its discretion in sentencing him to an aggregate term of 33 years without special consideration of his youth and personal history. And, in a supplemental brief, Lewis argues his sentence should be modified to concurrent terms.

¶ 24 II. ANALYSIS

¶ 25 A. Ineffective Assistance: Misidentification Theory

¶ 26 We first consider Lewis's claim that his trial counsel was ineffective for failing to investigate or provide evidence to support the theory that Allen Ross misidentified him as one of the two robbers. He argues that counsel "presumably based [the misidentification theory] on a police report" but failed to prove it up. Lewis submits that counsel could have used a police report to refresh Sergeant Allbritton's recollection about the second show-up or he could have subpoenaed the author of the report to testify about Ross's identification of a third person. He further points out that counsel made factual assertions in his closing argument that were not proven at trial. These putative deficiencies, according to Lewis's claim, reveal counsel did not adequately prepare for trial.

¶ 27 To establish that a defendant was deprived of his constitutional right to the effective assistance of counsel, the defendant must satisfy the two-pronged *Strickland* test: he must show (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable

probability the result of the proceeding would have been different, but for counsel's errors. *People v. Peterson*, 2017 IL 120331, ¶ 79 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). But in reviewing a claim of ineffective assistance, "a court accords much deference to trial counsel's judgment and strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance." *People v. Richardson*, 189 Ill. 2d 401, 413 (2000). Counsel's decisions regarding which witnesses to call and evidence to present are matters of trial strategy immune from ineffective assistance claims. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. However, counsel may be deemed ineffective for failing to present exculpatory evidence of which he was made aware. *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39.

¶ 28 However, "defense counsel's failure to present the testimony promised during his opening statement does not constitute *per se* ineffective assistance." *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 50. When witnesses testify differently than counsel promised in an opening statement, it is not necessarily the result of deficient representation. The difference could arise from lack of witness cooperation, witness "flipping," or other unforeseen events. *Id*. ¶¶ 52, 54. Thus, we must consider *why* counsel did not deliver the promised testimony before we could make any conclusions about the reasonableness of counsel's conduct or the probability of a different outcome. (Emphasis in original.) *Id*. ¶ 52.

¶ 29 In this case, counsel's opening statement showed his theory of the case was that, apart from Walker, Allen Ross identified a third person, who was not Lewis, as the second robber in a show-up on the night of the robbery and, therefore, Ross's later identification of Lewis was not reliable enough to find Lewis guilty beyond a reasonable doubt. However, the trial evidence did not support this theory. Ross denied that he identified the third person as one of the robbers and explained the third person had longer hair and a lighter complexion than the second robber. Counsel did not

attempt to impeach Ross but called Sergeant Allbritton in the defense's case and questioned him about the second show-up. Sergeant Allbritton testified he did not recall the identity of the person in the show-up or whether Ross identified that person as one of the robbers. Counsel did not ask Sergeant Allbritton if anything would refresh his recollection or attempt to impeach him. Nor did counsel call any other witness to elicit evidence to support that Ross identified the third person as one of the robbers.

¶ 30        Nevertheless, in closing argument, counsel asserted that Ross identified a person, who counsel named as Christopher Smith, as one of his robbers. Counsel further contended that Smith was arrested and, the next day, placed in a lineup that Ross viewed apart from the lineup in which he identified Walker. Counsel also argued that Ross's denial that he identified a third person was untruthful, as was Sergeant Allbritton's claimed lack of memory. The trial evidence included no mention of a person named Christopher Smith, nothing impeached Ross or Allbritton's testimony, and nothing supported that Ross identified a third person as one of the robbers. Additionally, counsel argued that Ross's Facebook identification of Lewis occurred "weeks or months" after the robbery. Yet, Ross testified on direct examination that it occurred the day after the robbery at the police station. On cross-examination, Lewis's counsel asked Ross when and where the Facebook identification occurred three times. Each time, Ross reiterated it happened the next day, June 2nd, at the police station. Similarly, in the subsequent hearing on Lewis's motion for new trial or acquittal, counsel argued that Ross's mother had some role in identifying Lewis from Facebook. The trial evidence did not mention Ross's mother at all. Rather, counsel started a line of questioning about other people who accompanied him to the Dolton police station. The questions included the name Leslie Mason. However, after an overruled objection from the State, counsel abandoned the line of questioning without eliciting who Leslie Mason was, who the other people

that accompanied Ross to the police station were, or how this was probative of any issue in the case.

¶ 31　　　At first glance, counsel's performance appears deficient. He did not deliver the evidence promised in his opening statement and his closing statement varied greatly from the actual trial evidence. His asserted theory suggested he had some basis to believe that Ross had identified a third person. The use of a specific name, Christopher Smith, in closing argument implies that the name appeared in materials obtained through discovery or other pretrial investigation. The additional show-ups and lineups, apart from those including Walker, also imply police apprehended and suspected a third person. Lewis's brief on appeal states that counsel "presumably based [his theory] on a police report." However, such a report is not contained in the record before us. Nor does the record disclose that some evidence could have been available for counsel to impeach Ross or Sergeant Allbritton or to introduce through another witness to support the misidentification theory. Without such reports or other evidence, we cannot assess the reasonableness of counsel's actions or the probability of a different outcome. Thus, Lewis's claim ultimately depends on matters outside the record. When an ineffective assistance claim relies on matters outside the record, reviewing courts cannot find the defendant has established his claim on direct appeal. See, *e.g.*, *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 138 (affirming conviction when defendant's claims of ineffective assistance of counsel relied on matters outside the record and, therefore, could not be resolved on direct appeal); *People v. Winkfield*, 2015 IL App (1st) 130205 (same). Accordingly, we find Lewis has not established ineffective assistance of counsel concerning the misidentification theory based on the record before us.

¶ 32　　　　　　　　B. Ineffective Assistance: Directed Finding

¶ 33    Next, Lewis claims his trial counsel was ineffective for failing to move for a directed finding on the UUWF counts at the close of the State's case in chief because the State had not presented evidence of his prior felony conviction.

¶ 34    The record rebuts that Lewis's counsel failed to move for a directed finding on the UUWF counts. Counsel stated he was joining Walker's motion for a directed finding, which requested acquittal on "all offenses." Likewise, the court clearly understood the motion to include all counts. It expressly denied the motion on all other counts after granting it for the aggravated assault count. Counsel did not offer a specific argument on the UUWF counts, only the aggravated discharge of a firearm count. But failure to make an argument in support of a directed finding does not violate a defendant's right to effective assistance of counsel. *People v. Davis*, 228 Ill. App. 3d 123, 129 (1992).

¶ 35    Even if Lewis's counsel had not moved for a directed verdict on the UUWF counts, we could not conclude the decision was objectively unreasonable or prejudicial since the trial court had the discretion to reopen the evidence for the State to cure the deficiency in its case. Indeed, refraining from requesting a directed verdict may be a reasonable strategy in those circumstances. See *People v. Bennett*, 331 Ill. App. 3d 198, 204-05 (2002) (Kuehn, J., specially concurring). The motion would call attention to the defect and counsel could expect most courts to be inclined to permit additional evidence. *Id*. Likewise, a decision to nevertheless move for a directed verdict under these circumstances is also a reasonable strategy. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-68 (2006).

¶ 36    To be sure, "[t]he trial court retains discretion to grant a motion to reopen the evidence even after a motion for directed verdict, and absent an abuse of that discretion, its decision will not be overturned on appeal." *Id*. at 202. Factors to consider on a motion to reopen the proofs include:

(1) whether the failure to introduce the evidence was inadvertent; (2) any surprise or unfair prejudice to the other party; (3) the importance of the new evidence; and (4) any cogent reasons that would have justified denying the motion to reopen. *People v. Gonzalez-Carrera*, 2014 IL App (2d) 130968, ¶ 21. In this case, the State's failure to introduce evidence of Lewis's predicate conviction appears to have been inadvertent and he does not contend otherwise. Nor could Lewis have been surprised or unfairly prejudiced since he does not dispute the fact of his predicate conviction. The certified copy of conviction was important because it proved an element of UUWF. And Lewis does not submit any cogent reason that would have justified denying a motion to reopen the proofs. Thus, even if counsel had made arguments in support of a directed verdict on the UUWF counts, the trial court would have likely permitted the State to present additional evidence of the predicate conviction. Consequently, there is no reasonable probability that Lewis would not have been convicted of the UUWF counts and, therefore, he cannot establish that he was deprived of the effective assistance of counsel on this basis.

¶ 37                                    C. Sentencing

¶ 38                    1. Failure to Consider Youth and Personal History

¶ 39            We turn to Lewis's sentencing claim. On appeal, Lewis asserts the circuit court abused its discretion by sentencing him to an aggregate term of 33 years without adequately considering the mitigating effects of his youth and personal history. Specifically, he contends his 33-year sentence is excessive because it is "wholly at odds with recent developments in the law" recognizing the lesser culpability and greater rehabilitative potential of youthful offenders. Based on "scientific advances about brain development that affect criminal culpability for youth and addicts," he argues aspects of his background should have been given more weight. Specifically, he asserts his background demonstrated significant rehabilitative potential as shown by completion of high

school, positive familial relationships, employment, and tutoring of other detainees. In addition, the presentence report indicated Lewis had untreated substance abuse issues, which he submits is also a developmental factor that mitigates his culpability. Though he was 22 years old at the time of these offenses, Lewis urges us to apply these developmental considerations to him and either reduce his sentence or remand for resentencing.

¶ 40 Lewis's brief asserts that his trial counsel failed to file a motion to reconsider sentence. On that basis, he requests us to review his sentencing claim under the plain error doctrine. He also contends his trial counsel was ineffective for failing to preserve these issues and for failing to advance his youth and substance abuse as mitigating factors at the sentencing hearing. Contrary to his assertion, the record shows that counsel did file a motion to reconsider sentence. The motion argued Lewis's sentence was excessive because it did not account for his rehabilitative potential and consecutive sentences were not warranted. Because the motion did not include the age-based arguments Lewis makes on appeal, the State asserts the claim is forfeited.

¶ 41 To preserve a claim of sentencing error, the defendant must make a contemporaneous objection and raise the issue in a postsentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Failure to specifically raise an issue in a posttrial motion forfeits the issue for review. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). In this case, the motion to reconsider sentence did not raise the specific issues asserted on appeal. Therefore, Lewis's sentencing claim is forfeited, and we will move to consider his request to consider the claim under the plain error doctrine.

¶ 42 When a defendant seeks review of an unpreserved claim of error, the plain error doctrine allows us to consider the claim when the defendant first shows a "clear or obvious error" occurred. *People v. Naylor*, 229 Ill. 2d 545, 593 (2008). Upon showing a clear or obvious error in sentencing, a defendant must also show "either that (1) the evidence at the sentencing hearing was closely

balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing."
*Hillier*, 237 Ill. 2d at 545, citing *People v. Hall*, 195 Ill. 2d 1, 18 (2000). The defendant bears the burden of persuasion under both prongs of the plain error doctrine. *Naylor*, 229 Ill. 2d at 593. The first step is to discern whether any clear or obvious error occurred at sentencing at all. *People v. Eppinger*, 2013 IL 114121, ¶ 19. Absent any error, there can be no plain error and the defendant's forfeiture will be honored. *Id.*

¶ 43        Insofar as Lewis's claim is based on "recent developments in the law" regarding youthful offenders, those legal developments simply do not apply to him. The authority relied upon prohibits mandatory life-without-parole for juvenile offenders (*Miller v. Alabama*, 567 U.S. 460 (2012)) or a term of years that amounts to the functional equivalent, referred to as *de facto* life, which is a prison term greater than 40 years (*People v. Buffer*, 2019 IL 122327, ¶ 41) unless a court gives special consideration to a juvenile's youth and its attendant circumstances (*People v. Holman*, 2017 IL 120655, ¶¶ 43-44; *People v. Lusby*, 2020 IL 124046, ¶¶ 33, 52). But the United States and Illinois Supreme Courts have only recognized these protections for juvenile offenders, that is persons under age 18 at the time of their offense. *People v. Harris*, 2018 IL 121932, ¶ 61. Lewis was not under age 18 at the time of this robbery. Some appellate court decisions have found some young adults may assert age-based claims challenging their sentences as applied under the proportionate penalties clause of the Illinois Constitution. See, *e.g.*, *People v. Minniefield*, 2020 IL App (1st) 170541 (remanding for 19-year-old offender to develop the record in postconviction proceedings to demonstrate how the evolving science of brain development in young adults may affect his 50-year sentence). But no court has extended these considerations for an offender who was over age 21. See *People v. Rivera*, 2020 IL App (1st) 171430, ¶¶ 25-27 (declining the same for offenders over 21). Thus, with Lewis being age 22 at the time of the robbery, our precedent

does not support that the trial court was required to give special consideration to his youth and its attendant circumstances in sentencing. Furthermore, even if these constitutional protections did extend to a 22-year-old offender, Lewis's sentence is below the 40-year threshold that triggers such protections. For these reasons, the circuit court was not required to give special consideration to Lewis's age and, therefore, did not err on this basis.

¶ 44 For the other aspects of Lewis's claim—his rehabilitative potential and substance abuse issues—we presume the trial court considered these factors in determining a sentence because they were presented at the sentencing hearing and were contained in the presentence investigation report. *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55 (it is presumed that the trial court considered mitigating evidence presented). To rebut that presumption, the defendant must point to evidence other than the sentence imposed. *Id*. Furthermore, the existence of mitigating factors does not require that the defendant receive the minimum sentence. *People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006).

¶ 45 Ultimately, we review a trial court's sentencing decision for an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 211 (2010). A sentence is considered an abuse of discretion where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id*. The trial court has broad discretion when imposing a sentence, and its sentencing decisions are given great deference because the trial judge, having observed the defendant and the proceedings, is in a better position to consider the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *Id*. at 212-13. We will not substitute our judgment for that of the trial court. *People v. Jones*, 2015 IL App (1st) 142597, ¶ 40.

¶ 46 Here, Lewis does not point to any evidence other than the sentence imposed. Therefore, he cannot rebut the presumption that the trial court considered mitigating factors including his rehabilitative potential. Moreover, we do not find the sentences imposed for each offense to be greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offenses. Accordingly, we find the court did not abuse its discretion in imposing the prison terms for each offense. Because we find no error occurred, Lewis has not met his burden on the first prong of plain error, and we honor the forfeiture of his sentencing claim.

¶ 47                                   2. Consecutive Sentences

¶ 48 Lastly, Lewis asks this court to modify his sentence to concurrent terms as the record did not support a finding that consecutive terms were necessary to protect the public. We agree.

¶ 49 In cases where consecutive sentences are, as here, not mandatory, concurrent sentences must be imposed, unless, considering the nature and circumstances of the offense and the history and character of the defendant, consecutive sentences "are required to protect the public from further criminal conduct by the defendant." 730 ILCS 5/5-8-4(c)(1) (West 2014). But consecutive sentences should be imposed sparingly (*People v. Buckner*, 2013 IL App (2d) 130083, ¶ 35) and reserved for exceptional cases (*People v. Phagan*, 2019 IL App (1st) 153031, ¶ 116). To impose discretionary consecutive sentences, the trial court need not use any particular words so long as the record indicates it believed consecutive sentences were necessary to protect the public. *Buckner*, 2013 IL App (2d) 130083, ¶ 37. Nevertheless, the trial court must set forth the basis for such sentences. *Id*. ¶ 35. A "boilerplate" ruling is insufficient. *Phagan*, 2019 IL App (1st) 153031, ¶ 125. We review the trial court's imposition of consecutive sentences for an abuse of discretion. *Buckner*, 2013 IL App (2d) 130083, ¶ 36. An abuse of discretion has occurred if the record does

not support the trial court's determination that consecutive sentences were necessary to protect the public. *Id.*

¶ 50        At the hearing on Lewis's motion to reconsider sentence, the trial court made an express finding that consecutive sentences were necessary to protect the public from his future criminal conduct. The court stated its basis for that conclusion was that the defendants fired a gun during the getaway as Ross pursued them. While the trial court made an express finding that consecutive sentences were necessary to protect the public and provided a basis for its finding, we find the asserted basis insufficient for that conclusion. The finding was little more than "boilerplate" and repeated the same reason the court cited for imposing sentences greater than the minimum for each of the separate offenses. *Cf. People v. Dorosz*, 217 Ill. App. 3d 1016 (1991) (finding articulated rationale for consecutive sentences insufficient where trial court "perfunctorily noted that it had relied on defendant's history and the trial proceedings in formulating a sentence"). Moreover, the trial court's finding does not reflect a sparing imposition of consecutive sentences. Considering that a 15-year mandatory enhancement applied and that the court had already factored the firing of a gun into its sentencing determination on the individual offenses, we believe the sparing use of consecutive sentences required a more exceptional and compelling basis to impose such sentences. No such basis was stated, nor is one apparent from the record.

¶ 51        For these reasons, we find the record does not support the trial court's determination that consecutive sentences were necessary to protect the public from Lewis's future criminal activity. Accordingly, the trial court's imposition of consecutive sentences was an abuse of discretion. Under our authority provided in Supreme Court Rule 615(b)(4), we modify Lewis's consecutive sentence for aggravated discharge of a firearm to run concurrent to his other convictions in this case.

¶ 52                            III. CONCLUSION

¶ 53          Based on the foregoing, we find Lewis was not deprived of the effective assistance of counsel. We also find that the trial court did not abuse its discretion in sentencing Lewis to the terms imposed for each offense, but we find the court erred in ordering the sentence for aggravated discharge of a firearm to run consecutively. We affirm the judgment of the circuit court but modify the sentences to run concurrently.

¶ 54          Affirmed as modified.