NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (4th) 210303-U

NO. 4-21-0303

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID W. PRATHER, Defendant-Appellant. | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Woodford County No. 20CF113 Honorable Charles M. Feeney III, Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) The evidence was sufficient to prove the knowing state of mind necessary for commission of the charged offense, violation of an order of protection (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)).

(2) In the sentencing hearing, the circuit court did not abuse its discretion by characterizing the defendant's conduct as a manipulation of the victim.

(3) Having failed to specifically raise the issues in his postsentencing motion, the defendant forfeited the issues of whether allegedly mitigating factors received enough weight in the sentencing decision.

(4) Adding the omitted issues to the postsentencing motion would have created no reasonable probability of a lighter sentence, and therefore the defendant's alternative claim that he received ineffective assistance from trial counsel, the drafter of the motion, lacks merit.

¶ 2    In the circuit court of Woodford County, a jury found defendant, David W. Prather,

guilty of violating an order of protection (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)). The court

sentenced him to a fine and to imprisonment for five years. He appeals on essentially three grounds.

¶ 3        First, according to defendant, the State failed to prove his knowledge of the order

of protection or of the conduct it prohibited. When we view all the evidence, however, in a light

most favorable to the prosecution as we are required to do, we conclude that a rational jury could

find, beyond a reasonable doubt, this element of *scienter*.

¶ 4        Second, defendant complains that, in the sentencing hearing, the circuit court found

he had manipulated the victim—a finding that, defendant contends, was inconsistent with the

proven facts. We are unable to characterize this finding as arbitrary. It had some arguable basis in

the evidence. Therefore, we are unconvinced that, in deciding the sentence, the court abused its

discretion by taking into account defendant's manipulation of the victim.

¶ 5        Third, defendant argues the circuit court failed to consider relevant mitigating

factors. We hold these mitigation issues to be procedurally forfeited because they were not

specifically raised in the postsentencing motion. Defendant claims, alternatively, that trial counsel

rendered ineffective assistance by leaving the mitigation issues out of the postsentencing motion.

Finding no prejudice from the omission, we reject this alternative claim of ineffective assistance

of counsel.

¶ 6        Therefore, we affirm the judgment.

¶ 7                        I. BACKGROUND

¶ 8        An indictment charged that on August 15, 2020, defendant violated section

12-3.4(a)(1)(i) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-3.4(a)(1)(i) (West

2020)) in that

>        "[H]aving been served with notice of the contents of an order of protection,
>
>        20-OP-61, issued on July 28, 2020, by the Circuit Court of Woodford County
>
>        pursuant to the Illinois Domestic Violence Act [(750 ILCS 60/101 *et seq.* (West

2020))], [defendant] did knowingly commit an act which was prohibited by the order of protection in that said defendant, through a third party, called Amanda Krutke, a protected party[,] and having been previously convicted of domestic battery on December 5, 2019[,] in Woodford County Case 19-CM-88."

¶ 9 In March 2021, in the State's case in chief in the jury trial, the circuit court admitted in evidence People's exhibit No. 2. This exhibit, which on its first page was certified by the circuit clerk as "[a] true copy of the original on file in [her] office," consisted of 16 pages. The first page of the exhibit (the page rubber-stamped with the circuit clerk's certification) was a proof of service signed by a Morgan County deputy sheriff, "D. Suttles." The proof of service was a fill-in-the-blank form. On some blank lines of the proof of service, under the preprinted language "I certify that I served this summons on defendants as follows," the following information was typed in: "Served Prather, David Wayne M-B-48 at 1300 Lincoln Ave., Jacksonville on 7/28/2020 @ 3:05 P.M."

¶ 10 The next 13 pages of People's exhibit No. 2 was an order of protection issued on July 28, 2020, at 9:50 a.m., in Woodford County case No. 20-OP-61. Each page of the order of protection was stamped with the word "COPY." The order of protection, it appears, was supposed to be only 12 pages long and was numbered "Page 1 of 12," "Page 2 of 12," and so forth. In People's exhibit No. 2, however, the first page of the copied order of protection was duplicated, making the copy 13 pages long.

¶ 11 According to the caption of the order of protection, the petitioner was Amanda Kay Krutke, the person "to be Protected by this Order." The named respondent was defendant. On its second page, in section 3, the order of protection commanded, "Respondent shall not have any communication Petitioner [*sic*] and stay away from Petitioner at all times." The next command

was that "Respondent shall stay at least 500 feet away from Petitioner at all times." Below that second command was a solid black rectangle about half an inch in height that extended across the page. On page 11, the order warned defendant, on pain of arrest and prosecution, "If you and Petitioner want to have contact with each other again, you must ask the Court to modify or dismiss this *Order of Protection*." (Emphasis in original.) Likewise, the order admonished the petitioner, "If you want to have contact with the Respondent again, you MUST ask the Court, in a written motion[,] to change or vacate this *Order of Protection*." (Emphasis in original.)

¶ 12    The next to last page of People's exhibit No. 2 was a facsimile cover sheet from "Shannon" of the Woodford County Sheriff's Office to the Morgan County sheriff at phone number "217-243-6998." The "Subject" in the cover sheet was "2020-OP-61," and the "Message" was "Please Serve."

¶ 13    The final page of People's exhibit No. 2 was a "Transaction Report" showing a fax of 15 pages was sent to "12172436998" at 1:36 p.m. on July 28, 2020.

¶ 14    After the admission of People's exhibit No. 2 and its publication to the jury, the State called Joshua Keim. He testified he was the deputy superintendent of the Woodford County jail, in which defendant was an inmate. As the deputy superintendent, Keim had access to the jail's computerized phone system. Whenever an inmate participated in a phone call or video visit, the system recorded it onto a server in the jail. By virtue of his training, Keim could retrieve these recordings from the server. He had retrieved and listened to the audio recordings of three phone calls that defendant made from the jail on August 15, 2020.

¶ 15    Keim testified he was able to identify three participants in these audio-recorded phone calls from August 15, 2020: (1) defendant, (2) someone named Kiki, and (3) Krutke. Keim recognized defendant's voice "[t]hrough dealing with him in the jail and the video visits." Keim

recognized Krutke's voice through a combination of two circumstances: first, to have video visitation, Krutke had to submit photographic identification ahead of time, and second, "a couple [of] months" after August 15, 2020, Krutke had three video visits with defendant. By the photographic identification that Krutke had provided, Keim was able to confirm it was Krutke in these video visits with defendant. Then Keim was able to match Krutke's voice in the video visits to her voice in the (earlier) audio recordings of August 15, 2020. As for Kiki, Keim was able to identify her voice because, in the phone calls of August 15, 2020, defendant telephoned Kiki and asked her to patch Krutke in so that the phone calls would be three-way.

¶ 16       Over objection by the defense, the circuit court found a sufficient foundation for People's exhibit No. 3, the audio recordings of the phone calls of August 15, 2020. The court admitted the exhibit in evidence, and with the court's permission, the prosecutor published the exhibit to the jury. In the recordings, defendant explained to Krutke how she could go about "drop[ping]" the order of protection.

¶ 17       After People's exhibit No. 3 was played for the jury, Keim resumed his testimony. He testified the jail had been "aware of the order of protection in this case." He explained that if an inmate were subject to an order of protection, the "general procedure" was to provide the jail a copy of the order of protection whereupon the communication system of the jail would be programmed to block any phone calls between the inmate and the protected person. But the block would only prevent the inmate from telephoning the protected person "directly." A three-way phone call, Keim testified, was "a way around the system."

¶ 18       Keim was the only witness the State called in the jury trial. After he testified, the State rested.

¶ 19        The defense then called Kim Salzman, the deputy clerk from the Woodford County circuit clerk's office who had signed the certification of People's exhibit No. 2. Salzman agreed with defense counsel that, about a week before the trial, defense counsel came to the circuit clerk's office and that, at his request, Salzman made a certified copy for him of the order of protection in case No. 20-OP-61. Defense counsel handed to Salzman defendant's exhibit No. 2, which, Salzman testified, was a copy of page 2 of the order of protection that was in the court file (the page containing, in section 3, the no-communication command). Salzman testified that People's exhibit No. 2 and defendant's exhibit No. 1 "say *** the same thing," other than that "one says [']copy['] at the top."

¶ 20        The circuit court admitted defendant's exhibit No. 1 in evidence. The exhibit is in the record. It is a single page, page 2 of the order of protection. The rectangular box in defendant's exhibit No. 1 is somewhat lighter in color, more of a dark grayish color, than the solid black rectangular box in People's exhibit No. 2. Through the dark gray tinting in the rectangle of defendant's exhibit No. 1, a text can barely be made out. This framed text reads as follows:

> "Respondent: If any protection in Section 3 is granted, Respondent must not have ANY physical, non-physical, direct or indirect contact with Petitioner. This also includes contact through others who may not know about the *Order of Protection*. It also forbids oral communication, written communication, sign language, telephone and cell phone calls, faxes, texts, tweets, emails, posts, or communication by any other social media, and all other communication with Petitioner." (Emphasis in original.)

¶ 21        After presenting defendant's exhibit No. 1 through Salzman's testimony, the defense rested.

¶ 22　　　　　The jury found defendant guilty of the charged offense, violation of an order of protection (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)).

¶ 23　　　　　The circuit court ordered a presentence investigation. After interviewing defendant and researching his criminal history, a probation officer, Michael Murphy, wrote a presentence investigation report. By his account to Murphy, defendant was "widowed and living with a significant other" (to quote from the presentence investigation report). Defendant had two children, one 18 and the other 10, both of whom lived in Mississippi. "When asked to describe his relationship and frequency of contact with his children, the defendant reported, 'Pretty good, I see them as much as I can.' " Defendant graduated from high school in Falkner, Mississippi, in 1990. In November 1994, he began serving in the United States Army. About a year and three months later, he was "discharged by way of General Under Honorable Conditions." He said he worked full-time for South Shore Industries from 2019 until 2020, when he was laid off because of the COVID-19 pandemic. He "reported 'family' as an additional source of income." Even though he admitted consuming about a gram of cocaine each month until 2019, he denied being addicted to drugs. He believed, however, that he had a problem with alcohol. He had completed the inpatient program at Gateway Foundation in Jacksonville, Illinois. He denied he was under the influence of drugs or alcohol when he committed the offense in the present case. He denied that obtaining drugs had anything to do with the offense. He described himself as being in good physical condition, but he reported he had been diagnosed with " 'Bipolar and Depression.' " He said he took Depakote and Seroquel for mood stabilization and Gabapentin for seizures and anxiety. He "ha[d] been placed on Supervised Probation twice pursuant to Tippah County, Mississippi[,] cases. Both cases were closed successfully."

¶ 24       The presentence investigation report further revealed that defendant had 12 prior criminal convictions. These included convictions for embezzlement, for which in 1998 he was sentenced to 5 years' imprisonment; domestic assault, for which in 2006 he was fined; car theft, for which in 2004 he was sentenced to probation; attempted aggravated assault, for which in 2012 he was sentenced to 20 years' imprisonment; domestic battery and criminal damage to property, for which in 2019 he was sentenced to 300 days in jail; and criminal trespass to a vehicle, for which in 2019 he was sentenced to 268 days in jail.

¶ 25       In the sentencing hearing, when the circuit court asked if any amendments should be made to the presentence investigation report, defense counsel told the court that defendant did not remember being convicted of domestic assault. Murphy was present at the sentencing hearing. In response to the court's inquiry, he explained that the domestic assault information had arrived with the other prior convictions from Hardeman County, Tennessee. Defense counsel said, "[Defendant] recalls the other Hardeman County entries. There's four or five other ones which were no dispute. It's just that one." The court decided, "That will stay as stated."

¶ 26       The circuit court then asked the prosecutor if he had any evidence to present in the sentencing hearing. The prosecutor chose to rely merely on the presentence investigation report. The court then invited defense counsel to present any evidence. He called Krutke.

¶ 27       Krutke testified she first became acquainted with defendant in 2016. They met through an online dating site when he was an inmate of Meridian Correctional Center in Mississippi. In 2019, when he was released from prison in Mississippi, he came to live with Krutke in Naperville, Illinois. Later, when Krutke's "contract job" in Naperville ended, she "needed to move home," and the two of them relocated to El Paso, Illinois, where they continued living together.

¶ 28    As Krutke recounted in her testimony, she experienced "some issues with" defendant after he began living with her. For one thing, when they lived in Naperville, he took her car without her permission and was gone for several days. She was unable to reach him, and because she had no other vehicle, she missed a day of work. For another thing, he committed a domestic battery upon her in 2019, for which he was convicted and was sentenced to jail. Krutke described the domestic battery as follows: "[A]t that time he reached in to grab ahold of me, and I was able to put the window up. And he did touch my shoulder, but he did not hurt me." After serving his jail sentence for the domestic battery, defendant returned to Krutke, and they resumed living together as before. The next year, another domestic issue arose, leading to case No. 20-OP-61.

¶ 29    The order of protection was occasioned by an argument that Krutke and defendant had in July 2020. Krutke testified that defendant had "a history of mental illness, bipolar disorder" and that, at the time of this incident, he had not been taking his medications. Also, he was "under the influence." As they argued, he backed her against the garage wall. She became afraid. She had been physically injured before by another man, by the father of her children, and she did not know if defendant intended to hurt her. Defendant advanced close enough to her that she became unsteady on her feet and fell backward against the garage wall. To make enough space to escape, she pushed him forward. On the basis of that incident, she petitioned for, and was granted, the order of protection on July 28, 2020.

¶ 30    On August 13, 2020, Krutke learned from defendant's mother (Coreen Prather, according to the presentence investigation report) that defendant "had gone to treatment for alcohol." Given that news, Krutke "felt that [she] was no longer in danger from him." Therefore, Krutke requested defendant's mother to convey to defendant the message that Krutke "was no

longer angry at him and that [she] would proceed with dropping charges" (by which she meant requesting the vacation of the order of protection). "[A]bout three weeks later," Krutke "g[o]t [the order or protection] dropped."

¶ 31      On cross-examination, the prosecutor asked Krutke how she would describe her relationship with defendant. She answered:

"A. It wasn't until he came to live with me that I had really got to know who he was.

Q. And what do you mean by that?

A. More history. Some of the things that he had told me in phone conversation when he was in Meridian [Correctional Center] weren't necessarily the truth. And I didn't find out certain truths until after he was with me.

Q. Like what?

A. Like what he went to prison for.

Q. What did he go to prison for?

A. I am still not 100 percent sure. I think it was some type of aggravated assault charge. I don't know the specifics.

Q. Okay.

A. And just more about his background. That he had been married, but he had issues with substance abuse and alcohol.

\* \* \*

Q. Are you aware whether his aggravated assault that led to him going to prison was him hitting a woman with his car?

A. No. What was relayed to me was an attempt to.

Q. Hit her with his car?

A. (Nodding head.)"

¶ 32    Krutke was the only witness called in the sentencing hearing. After her testimony, the circuit court heard arguments on what would be a fitting sentence for defendant. The prosecutor observed that, on the one hand, the phone calls neither threatened nor caused harm and that defendant had undergone rehabilitative treatment. On the other hand, the prosecutor observed that defendant had "a pretty lengthy history of criminal activity." He had six prior misdemeanor convictions and three prior felony convictions, and in addition to being repeatedly jailed, he had repeatedly gone to prison. He had been sentenced to 2 years' imprisonment for car theft and to 20 years' imprisonment for attempted aggravated assault—the latter being, the prosecutor remarked, a hefty prison sentence. In the prosecutor's view, defendant had been a "negative influence" in Krutke's life. Through the trickery of third-party calling, he had shown a willingness to exploit the "soft spot[ ]" that Krutke, like many other victims of domestic abuse, seemed to have for her abuser. Because of defendant's criminal record, the cunning intentionality of the present offense, and the need to deter others from violating orders of protection, the prosecutor recommended the maximum extended prison term of six years and a fine of $7500. See 720 ILCS 5/12-3.4(d) (West 2020); 730 ILCS 5/5-5-3.2(b)(1), 5-4.5-45(a) (West 2020).

¶ 33    Defense counsel disputed that defendant intended the third-party calling to be a ruse. Rather, defense counsel argued, "[T]he court knows if you do a three-way call, whoever sets up the call pays the expense of the phone call. So that would explain financially as to why it was done three-way to—the person that initiates that call pays that expense, not the person in the jail." While acknowledging there was no excuse for violating the order of protection, defense counsel noted that the violation was never "meant to cause any harm." Nor was the violation a fortuitous

and unwelcome intrusion into Krutke's life. Instead, "[i]t was just to get the order of protection dropped"—an idea that was precipitated not by defendant but "by his significant other, [the] lady who testified here in court today." Therefore, defense counsel requested that the circuit court impose a sentence of probation.

¶ 34    After the attorneys finished making their sentencing arguments, the circuit court said:

> "Court has considered the evidence brought forth at trial. The court has considered the Presentence Investigation and the financial impact of incarceration in the Illinois Department of Corrections. Court has considered the evidence and information offered at this hearing. Court has considered the arguments as to sentencing alternatives. Court has considered the factors in aggravation and the factors in mitigation."

¶ 35    Generally, the circuit court granted, it was a mitigating factor that the offense neither caused nor threatened physical harm. Because violations of orders of protection, however, typically caused no harm, the court reasoned that this factor "rarely would be mitigating."

¶ 36    The "most significant aggravation statutory-wise," in the circuit court's view, was "defendant's criminal history," which the court regarded as "horrible. Also, it was of particular concern to the court was that when defendant violated the order of protection, he was in jail. The court remarked to defendant:

> "[F]or whatever reason you were incarcerated, [and] from the bowels of that jail you found a way to make a call out to somebody that you could make a call to and then had them—you had them provided with the instructions on how to make this

- 12 -

nefarious call to the victim. And that shocks the conscience of the court, that from within the bowels of the jail people find a way to continue to be lawless."

"[I]t is my job," the court explained to defendant, "to protect society from people that essentially flip off the law and have no regard whatsoever for the law. And that, in my opinion, Mr. Prather, is you. Your record speaks volumes of it. Multiple domestic situations, multiple drug situations, multiple crimes of moral turpitude."

¶ 37    By the order of protection, the circuit court had attempted to give a period of respite to Krutke from her troubled domestic situation. The court commented to defendant, "And instead of the peace that was to be given to Ms. Krutke by virtue of the order of protection[,] you found a way to make this call and to apply pressure to Ms. Krutke." The court continued:

"And her own testimony today shows how manipulative you've been with her. You found a way *** to come up here and live with her after your release from the Department of Corrections in Mississippi. And then she doesn't even know who you are, and you come in here, you steal her car. For whatever reason she keeps you around. You—she doesn't even know who you are in the sense of your criminal history."

¶ 38    In view of his criminal history and his custodial violation of the order of protection, the circuit court was skeptical that "defendant [was] capable and ha[d] enough regard for the law and its requirements *** to obey a probation order." Obeying a probation order would mean obeying a court order, and "[t]his case just screams out that that's not true": defendant did not obey court orders, even under optimal circumstances. Therefore, rejecting defense counsel's recommendation of probation, the court sentenced defendant to five years' imprisonment. The court also imposed a fine of $2000.

¶ 39    Through his defense counsel, defendant filed a postsentencing motion, which requested the circuit court to reduce the prison sentence to probation. The only reason the motion gave for the proposed reduction was that the court had erred (so the motion claimed) by accusing defendant of manipulation. The motion argued, "In no[ ] way was the Defendant manipulative in making the telephone conversation of August 15, 2020, since it was his girlfriend who initiated the contact through Defendant's mother."

¶ 40    In the hearing on his postsentencing motion, defense counsel discussed only the issue of manipulation, which was the sole issue the motion raised. He said:

> "Very basically, as I can recall from the sentencing hearing, the court cited as the single—or what stands out in my head as to my client being manipulative, and that justified the five-year sentence. I just wanted to have the court reconsider that because the evidence was to the contrary. He was prompted by his mother who said she had a conversation with the alleged victim in this case to—that she was dropping the order of protection, and that's why he called her.
>
> So I just wanted to have that corrected for the record and ask the court to revisit the sentence the court imposed thereafter. Thank you."

¶ 41    The prosecutor countered that, in deciding the sentence, the circuit court considered not just manipulation but a variety of other factors, including the evidence in the jury trial and defendant's "voluminous" criminal record. "And, regardless," the prosecutor continued, "the court is allowed to draw inferences based on statements made, and I think that's what happened here." The prosecutor maintained that, "based on the defendant's criminal history and everything [the court had] heard," imprisonment for five years "was an appropriate sentence."

¶ 42    The circuit court declined to reduce the sentence. The court again characterized defendant's criminal history as "terrible," "consist[ing] of multiple sentences to the Department of Corrections, one for as long as 20 years," and "includ[ing] domestic assaults and domestic battery"—which, the court added, were "particularly relevant to the violation of an order of protection subsequent offense." As for the question of manipulation, the court did not "particularly recall the specific words [it] used." In any event, from listening to the recording of the phone calls, the court had received the impression that "defendant's purpose in making these three-way calls *** was to, in fact, manipulate" Krutke "to drop the order of protection." Therefore, the court denied the postsentencing motion.

¶ 43    This appeal followed.

¶ 44                    II. ANALYSIS

¶ 45    A. The Sufficiency of the Evidence to Support the Jury's Finding That Defendant
        Was Aware of the No-Communication Command in the Order of Protection

¶ 46    The statute that the indictment charged defendant with violating, section 12-3.4(a)(1)(i) of the Criminal Code (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)), required "a showing that the defendant knowingly violated a provision of the order of protection." *People v. Ramos*, 316 Ill. App. 3d 18, 24 (2000). Defendant does not dispute that on August 15, 2020, while the order of protection was still in force, he knowingly communicated with Krutke by telephone. For two reasons, however, defendant argues the State failed to prove his knowledge, his "conscious[ ] aware[ness]" (720 ILCS 5/4-5(a) (West 2020)), that he thereby violated an order of protection.

¶ 47    First, the proof of service (the first page of People's exhibit No. 2) said that a "summons" was served, and an order of protection was not a summons. The State never called

Suttles to clarify that the document he served on defendant was the order of protection instead of a summons. Granted, in the phone calls of August 15, 2020, defendant manifested his knowledge that an order of protection existed. Even so, defendant argues, absent proof that the order of protection was served upon him and absent proof that he was informed of its contents by some other means, his knowledge of its contents—and hence his knowing violation of its contents—was unproven.

¶ 48    Whenever a defendant in a criminal appeal challenges the sufficiency of the evidence, we view all the evidence in a light most favorable to the prosecution, asking what inferences could reasonably be drawn in the prosecution's favor. *People v. Newton*, 2018 IL 122958, ¶ 24. Defendant is correct that our deferential standard of review would not justify "random speculations in favor of the prosecution." *People v. Dye*, 2015 IL App (4th) 130799, ¶ 12. Likewise, as defendant reminds us, we should not content ourselves with the mere possibility that he "may have" committed the charged offense. *People v. Smith*, 185 Ill. 2d 532, 546 (1999). The inferences we draw in the prosecution's favor must be reasonable. See *Newton*, 2018 IL 122958, ¶ 24. The inferences need not be inevitable, but they must be inferences a rational, fair-minded trier of fact could reasonably draw from the proven circumstances. See *People v. Soto*, 2022 IL App (1st) 201208, ¶ 117.

¶ 49    Viewing the evidence in a light most favorable to the prosecution (see *Newton*, 2018 IL 122958, ¶ 24), we find circumstantial evidence that the "summons" referenced in the proof of service was indeed the order of protection. For one thing, in the copy that the circuit clerk certified, the order of protection is attached to the proof of service. For another thing, the fax to the Morgan County Sheriff's Office was 15 pages long, which is the length of People's exhibit No. 2, minus the fax transmission sheet. Also, Suttles served defendant less than two hours after

the fax transmission—a fax transmission that, in its cover sheet, specifically referenced "2020-OP-61." Finally, defendant's resort to the expedient of third-party calling arguably reveals his knowledge of the no-contact provision in the order of protection. The jury did not have to believe the innocent explanation that, by the three-way calling, defendant was merely trying to save Krutke money. See *People v. Smith*, 2021 IL App (5th) 190066, ¶ 69 (pointing out that "the jury is not required to search for any possible innocent explanation and elevate [it] to the status of reasonable doubt." (Internal quotation marks omitted)). To be sure, the proof of service said "summons" instead of "order of protection," but the jury could have reasonably attributed this discrepancy to the use of a boilerplate form.

¶ 50　　　　Second, even if he was served with the order of protection, defendant argues that because the word "with" was left out of the command "Respondent shall not have any communication Petitioner [*sic*] and stay away from Petitioner at all times," "the parameters of the order of protection [were] unclear." He further contends that the dark tinting in the rectangular box blotted out the explanation of the preceding ungrammatical sentence—or, at least, the State failed to prove the coloration was less obscuring in the copy served on him than in People's exhibit No. 2.

¶ 51　　　　Surely, defendant exaggerates the difficulty that the omission of the word "with" posed. A rational trier of fact could find that defendant had no trouble mentally supplying the missing word "with" in the command "Respondent shall not have any communication Petitioner [*sic*] and stay away from Petitioner at all times." Besides, the order of protection further read, "If you and Petitioner want to have contact with each other again, you must ask the Court to modify or dismiss this *Order of Protection*." (Emphasis in original.) The commonly accepted meaning of the unqualified word "contact" includes communication. See Merriam-Webster's Collegiate

Dictionary at 268 (11th ed. 2020) (listing "COMMUNICATION" as a synonym of the noun "contact" and defining the verb "contact" as including "to get in communication with").

¶ 52    Looking at all the evidence, then, in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, the knowing state of mind described by section 12-3.4(a)(1)(i) of the Criminal Code (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)). See *Newton*, 2018 IL 122958, ¶ 24.

¶ 53                        B. Whether Five Years' Imprisonment Was Too Severe

¶ 54                        1. *The "Manipulation" of Krutke*

¶ 55    Before imposing the five-year prison sentence, the circuit court criticized defendant for "manipulating" Krutke. Defendant regards that criticism as baseless and unjust. He points out that it was Krutke, not he, who came up with the idea of getting the order of protection vacated. Defendant merely offered her practical advice on how to accomplish what she already—quite on her own—had resolved to do.

¶ 56    A resolution, though, is useless without implementation. Evidently, defendant saw the need to persuade Krutke—or, more pejoratively, to manipulate her—to *carry through* with her expressed resolution to drop the order of protection. Manipulation is using unfair means to persuade someone to act to one's own advantage. There is some logic to the circuit court's finding of manipulation. Arguably, the unfairness aspect of the manipulation was defendant's using Krutke's affection for him as a means of persuading her to carry through with an action that was to his advantage but possibly to her disadvantage: obtaining a vacation of the order of protection.

¶ 57    In any event, the perceived manipulation was not limited to the phone calls from the Woodford County jail. In the circuit court's view, the manipulation extended back to the very beginning of defendant's relationship with Krutke, when, from Meridian Correctional Center,

- 18 -

defendant presented himself to Krutke as a potential significant other without being truthful to her about why he was in prison. In deciding on a sentence, the court had to take into consideration defendant's "general moral character." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). We cannot say it was arbitrary or clearly illogical of the court to perceive manipulation in defendant's relationship with Krutke. See *Perruquet*, 68 Ill. 2d at 154 ("reaffirm[ing] [the supreme court's] long-standing rule that absent an abuse of discretion by the trial court[,] a sentence may not be altered upon review"); *Long v. Mathew*, 336 Ill. App. 3d 595, 600 (2003) (describing an abuse of discretion as arbitrariness or clear illogicality).

¶ 58        2. *Defendant's Assertion That the Circuit Court "Ignored Mitigating Evidence"*

¶ 59        Defendant contends that, in deciding on a sentence of five years' imprisonment, the circuit court "ignored" "the mitigating factors of mental illness, addiction, the impact on the defendant's children, work history, military service, and overall rehabilitative potential." On the authority of *People v. Heider*, 231 Ill. 2d 1, 18 (2008), defendant maintains that this sentencing claim was preserved for review. He reasons that because defense counsel filed a postsentencing motion claiming the sentence was excessive and because "the errors at issue concern[ ] the excessiveness of [defendant's] sentence," we "should find that the claim is preserved."

¶ 60        *Heider*, however, is distinguishable. In *Heider*, the postsentencing motion had "expressly mentioned" the sentencing issue that the defendant sought to raise on appeal. *Id.* at 15. Besides, in the hearing on the postsentencing motion, the defendant's attorney argued the sentencing issue, specifically and at length, thereby giving the circuit court a full opportunity to consider the issue before the defendant raised the issue in the reviewing courts. *Id.* at 18. In the present case, by contrast, defendant's motion to reconsider the sentence said nothing about "mental illness, addiction, the impact on the defendant's children, work history, military service, and

- 19 -

overall rehabilitative potential." Nor did defense counsel so much as mention those topics in the hearing on the motion. For the first time, on appeal, defendant raises sentencing issues he had an opportunity to raise in the circuit court, an opportunity he passed by.

¶ 61 The issue-preservation standards that apply to posttrial motions apply with equal force to postsentencing motions. *People v. Baez*, 241 Ill. 2d 44, 129-30 (2011). "Failure to specifically raise an issue in a posttrial motion forfeits the issue for review." *People v. Lewis*, 2021 IL App (1st) 182424-U, ¶ 41 (citing *People v. Woods*, 214 Ill. 2d 455, 470 (2005)). The same holds true for a postsentencing motion, "which is the functional equivalent of a posttrial motion for the purpose of preserving issues for appeal." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 130. Failure to raise a sentencing issue with specificity in a postsentencing motion forfeits the issue for review. See *People v. Leggans*, 253 Ill. App. 3d 724, 732 (1993); *People v. Johnson*, 250 Ill. App. 3d 887, 893 (1993); *Lewis*, 2021 IL App (1st) 182424-U, ¶ 41. A "central purpose" of a posttrial motion—and, hence, of a postsentencing motion—"is to give the reviewing court the benefit of the trial court's judgment on the specific allegation." *Johnson*, 250 Ill. App. 3d at 893. "Broad and general allegations in a post-trial motion"—or in a postsentencing motion—"are inadequate to advise the court of the challenge being raised, and are inadequate to preserve an issue for appellate review." *Id.* We hold, therefore, that defendant has forfeited all sentencing issues other than the manipulation issue (which we already have addressed). See *Lewis*, 2021 IL App (1st) 182424-U, ¶ 41.

¶ 62 Foreseeing the possibility of such a forfeiture, defendant accuses trial counsel of rendering ineffective assistance in the drafting of the postsentencing motion. "A claim of ineffective assistance may be raised for the first time on direct appeal." *People v. Almanza*, 2022 IL App (4th) 210034-U, ¶ 17.

¶ 63        A claim of ineffective assistance has two elements: (1) deficient performance by defense counsel and (2) resulting prejudice to the defense. *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 64. Because both elements are indispensable, case law encourages us to begin with the element of prejudice, if it is easier to do so, so that we might avoid the task of "grading" defense counsel's performance. See *Strickland v. Washington*, 466 U.S. 668, 697 (1984); *People v. Taylor*, 166 Ill. 2d 414, 436 (1995).

¶ 64        To establish that he suffered prejudice from defense counsel's allegedly substandard performance, defendant "must show that there is a reasonable probability that, but for the counsel's errors, the result of the proceeding"—in this case, the sentencing hearing—"would have been different," that is to say, more favorable to defendant. *People v. Patterson*, 192 Ill. 2d 93, 122 (2000). Defendant need not show a 51% likelihood of a more lenient sentence. In other words, the standard of "reasonable probability" "does not require a defendant to demonstrate that counsel's conduct more likely than not altered the outcome in the case." *Id.* Instead, "a reasonable probability 'is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). Prejudice comes down to a shaking of confidence.

¶ 65        A threshold problem with defendant's theory of prejudice is that all of the supposedly mitigating factors that he identifies in his brief are set forth plainly in the presentence investigation report—a report that, in the sentencing hearing, the circuit court said it had read. The court prefaced its sentencing analysis by noting, "The court has considered the Presentence Investigation and the financial impact of incarceration in the Illinois Department of Corrections." In his argument on the mitigating factors, defendant cites over and over again to the presentence investigation report. Therefore, asserting that the court "ignored" or "failed to consider" these allegedly mitigating factors, all of which came from the presentence investigation report, is almost

- 21 -

tantamount to accusing the court of lying. See *People v. Yates*, 2022 IL App (3d) 180577-U, ¶ 21 (remarking that "[w]hile the court did not expressly consider [the] defendant's drug use, it indicated that it had considered the [presentence investigation report]," in which his drug use was described).

¶ 66 Maybe defendant's position would be better expressed this way: a more thorough postsentencing motion might have changed the circuit court's reading of the presentence investigation report, giving the court a deeper appreciation of the mitigating circumstances set forth therein. In other words, the argument would run, if only the postsentencing motion had highlighted the factors that mitigated the offense, there is a reasonable probability that the court would have seen those factors more vividly, would have accorded them more weight, and would have imposed a less severe punishment.

¶ 67 A "mitigating circumstance" is (1) "[a] fact or situation that does not justify or excuse a wrongful act or offense but that reduces the degree of culpability and thus may reduce *** the punishment (in a criminal case)" or (2) "[a] fact or situation that does not bear on the question of a defendant's guilt but that may bear on a court's possibly lessening the severity of its judgment." Black's Law Dictionary (11th ed. 2019) (sub-definition of "mitigating circumstance" in the definition of "circumstance"). Because the factors that defendant identifies in his brief have little or no tendency to be mitigating, we find no reasonable probability that emphasizing them for the circuit court would have yielded a lesser punishment. Let us take the factors one at a time.

¶ 68                                a. Mental Illness

¶ 69 Even if it is "insufficient to establish the defense of insanity," a "serious mental illness" deserves "weight in favor of withholding or minimizing a sentence of imprisonment" if the "serious mental illness" "substantially affected" the defendant's "ability to understand the

nature of his or her acts or to conform his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(4) (West 2020). The record appears to lack evidence that defendant's bipolar disorder impaired his ability to understand the nature of his acts or to conform his conduct to the requirements of the law—or that the bipolar disorder had anything to do with his violation of the order of protection. The supreme court "has repeatedly held that information about a defendant's mental or psychological impairments is not inherently mitigating." (Internal quotation marks omitted.) *People v. Madej*, 177 Ill. 2d 116, 139 (1997); see also *People v. Romero*, 2022 IL App (2d) 191106-U, ¶ 36 ("Mental illness is not inherently mitigating for sentencing purposes.").

¶ 70                          b. Alcoholism and Drug Addiction

¶ 71          On the authority of *People v. Young*, 250 Ill. App. 3d 55, 65-66 (1993), and *People v. Treadway*, 138 Ill. App. 3d 899, 905 (1985), defendant argues that his "struggle with drugs and alcohol" was a mitigating factor to which the circuit court was obliged to give weight. According to more recent decisions by the appellate court, however, "the trial court is not required to view drug addiction as a mitigating factor." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105; see also *Yates*, 2022 IL App (3d) 180577-U, ¶ 21; *People v. Clinton*, 2021 IL App (1st) 190694-U, ¶ 21. More to the point, the supreme court has squarely rejected the argument that "a sentencing judge must consider [the] defendant's drug use as a mitigating factor in sentencing decisions." *People v. Shatner*, 174 Ill. 2d 133, 159 (1996). Nor is alcoholism inherently mitigating. See *Clinton*, 2021 IL App (1st) 190694-U, ¶ 21. "[T]he sentencing judge was free to conclude that [the] defendant's dependencies and disorder were aggravating and simply had no mitigating value." *People v. Ballard*, 206 Ill. 2d 151, 190 (2002).

¶ 72                    c. The Effect of Defendant's Incarceration on His Children

¶ 73 It would be a statutory factor in mitigation if defendant were "the parent of a child *** whose well-being [would] be negatively affected by the parent's absence." 730 ILCS 5/5-5-3.1(a)(18) (West 2020). Apparently, though, at the time of sentencing, defendant already was largely absent, at least geographically. In 2019, upon being released from prison, he moved from Mississippi, where his children were, to Illinois, where Krutke was. It is unclear how defendant parented his children from 600 miles away. We do not know if he has any "role *** in the day-to-day educational and medical needs" of his children (*id.* § 5-5-3.1(a)(18)(C)) or that he has a meaningful "relationship" with them (*id.* § 5-5-3.1(a)(18)(D)) or that he contributes toward their "financial support" (*id.* § 5-5-3.1(a)(18)(F)). We do not know if defendant's children would suffer any negative effects from his imprisonment. If all defendant could say about his children was that his relationship with them was " '[p]retty good' " and that he " '[saw] them as much as [he] could,' " section 5-5-3.1(a)(18) offered little potential for mitigation.

¶ 74                                             d. Work History

¶ 75 Defendant faults defense counsel for failing to highlight his "steady work history." But all the presentence investigation report has to say about defendant's work history was that for one year, from 2019 to 2020, he worked for South Shore Industries. The mitigative value of a single year of employment was minimal to nonexistent.

¶ 76                                             e. Military Service

¶ 77 Defendant claims he "had a history of military service and an honorable discharge from the military." Actually, he reported to Murphy that he received a general discharge under honorable conditions. "It is *** clear that an individual who receives a general discharge under honorable conditions has not been honorably discharged." *Boylan v. Matejka*, 331 Ill. App. 3d 96, 100 (2002). While a general discharge under honorable conditions is not as bad as a discharge

under other than honorable conditions, a bad conduct discharge, or a dishonorable discharge, it is not as good as an honorable discharge. See *Colon v. United States*, 71 Fed. Cl. 473, 476 n.3 (2006). " 'Characterization of service as General (under honorable conditions) is warranted when significant negative aspects of the member's conduct or performance of duty outweigh positive aspects of the member's military record.' " *Thomas v. United States*, 47 Fed. Cl. 560, 579 (2000) (quoting 32 C.F.R. Part 41, App. A, Part 2.C.2.b.(2) (1996) (guidance from the Office of the Secretary of Defense to enlisted members)). It appears that, instead of serving his full term of enlistment in the United States Army, defendant was administratively separated—we do not know why. In any event, military service that ends prematurely in a general discharge under honorable conditions is not very mitigating.

¶ 78                                f. Rehabilitative Potential

¶ 79          The circuit court explicitly considered defendant's rehabilitative potential. The court decided that, given his criminal history and his readiness to disobey a court order in the very bowels of the jail, defendant lacked rehabilitative potential and probation was not an alternative for him. Filing a postsentencing motion that portrayed defendant as someone with significant rehabilitative potential would not have created a reasonable probability of a lighter sentence. See *Patterson*, 192 Ill. 2d at 122.

¶ 80          In sum, defendant has failed to show prejudice from the complained-of omissions in the postsentencing motion; therefore, his claim of ineffective assistance of counsel fails. See *Aquisto*, 2022 IL App (4th) 200081, ¶ 64.

¶ 81                                III. CONCLUSION

¶ 82          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 83          Affirmed.